Filed 11/5/14

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> SANTA FE PACIFIC PIPELINES, INC., et al., <br><br> Defendants and Appellants. | B242864 <br><br> (Los Angeles County Super. Ct. No. BC319170) |


APPEAL from judgments of the Superior Court of Los Angeles County, Eli Chernow, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Affirmed in part; reversed in part and remanded.

Mayer Brown, Donald Falk, Neil M. Soltman, Michael F. Kerr, Germain D. Labat, Matthew Marmolego; Cooley, Steven M. Strauss, M. Ray Hartman III and Summer J. Wynn for Defendants and Appellants.

McKenna Long & Aldridge, Thomas F. Winfield III and Michael H. Wallenstein for Plaintiff and Respondent.

## INTRODUCTION

This is the latest of multiple appeals in a case in which courts have been called upon to determine the amount of rent a pipeline company must pay to a railroad for the use of land underneath its rights-of-way, most of which were initially granted to it by the federal government beginning in the mid-19th century in order to build and operate transcontinental railroads. The rent is to be determined by the terms of a settlement agreement entered into in 1994 arising out of previous litigation between the parties—former sister companies that separated, and have been involved in lawsuits ever since.

Appellants are Santa Fe Pacific Pipelines, Inc., previously known as Southern Pacific Pipelines, Inc.; SFPP, L.P., Kinder Morgan Operating L.P. "D"; and Kinder Morgan G.P., Inc. (collectively the Pipeline). Respondent is Union Pacific Railroad Company, successor to Southern Pacific Transportation Company (the Railroad). The two companies previously existed under the same corporate umbrella. In that context, they entered into master agreements in the mid-1950's under which the Railroad granted easements to the Pipeline in the subsurface underlying the Railroad's rights-of-way in order to convey its oil, gas and other petroleum products across the western United States. In 1983, the parties revised and revamped their master agreement, maintaining the essential element that the Pipeline continue to use the subsurface to move its commodities. But in the late 1980's—30 years after the initial easements were granted—their parent company merged with another company. The Railroad was divested, and the companies were no longer sisters. Soon thereafter, disputes arose between the Railroad and the Pipeline companies. Litigation began in 1991 when the Railroad sued the Pipeline, complaining that the master agreement under which they were operating was not negotiated at arms-length, and that the Railroad was not receiving a fair deal. Three years later, this case resolved. In 1994, the parties executed a settlement agreement that set the parameters for how rent would be determined on the Pipeline's easements.

Since then, there have been three court trials and five appellate decisions relating to the enforcement of this settlement agreement. The first case was brought in 1994. We are

2

now called upon to review the most recent court trial, which generated over 42,000 pages of testimony and concomitant volumes of exhibits and appendices and other documents. The judgment under review arose out of a declaratory relief action where the Railroad sought a determination of the rent due from the Pipeline for the continued use of its easements from 2004 to 2014.[1] The Railroad obtained a declaration that the rent due was in excess of $14 million per year. The trial court entered a judgment reflecting that the total back rent due was $81,589,584, plus interest in the amount of $19,372,195.50, up to the date of entry of the judgment. The Pipeline appealed.

On appeal, the Pipeline makes the following claims: (1) The trial court erred in finding that the prior judgment did not collaterally estop the relitigation of several issues and deciding them anew in the instant case; (2) the trial court made errors in applying the formula to calculate the rent due; (3) it was error to include rent for easements on land that had been sold by the Railroad before the 1994 settlement agreement was executed; (4) the trial court lacked authority to issue a money judgment, as opposed to a mere declaration of the amount of rent due, and therefore lacked the authority to award prejudgment interest. As to the trial court's ruling declining to apply collateral estoppel to this action, we affirm. As to the remaining issues, we reverse and remand for the reasons discussed below.

A recurrent, yet heretofore unresolved, theme permeating this and prior cases between the parties is the nature of the Railroad's interest in the property through which the pipelines run. This issue—whether the Railroad had sufficient interest in the land beneath its rights-of-way to grant the subsurface easements and collect rent for their use—was raised by the Pipeline in the 1994 case and raised again in the instant case. It was extensively litigated. In the 1994 case, the court assumed (but did not find) that the Railroad held the land in fee. In this case, the court concluded the Railroad had sufficient interest in the land to collect rent from the Pipeline, without determining the actual nature of that interest.

There is a large body of law—reflected by federal statutes, judicial opinions, and regulatory decisions—that bear on the nature of a railroad's property rights, whether it can

---

[1] An earlier judgment determined the rent due from 1994 to 2004.

grant easements to third parties and collect rent from them, and the interests of adjacent landowners and the federal government.  The trial court appears to have reached its conclusions and entered its judgment without fully analyzing this body of law, or applying it to these facts.  The absence of a determination on this issue undermines the judgment.

We address the law relating to railroad rights-of-way in an effort to resolve the legal issues that apply to property interests in this land and, by extension, the Railroad's right to grant and lease subsurface easements to the Pipeline.  To this end, we begin with a brief summary of the historical context within which this dispute arises.

## HISTORICAL CONTEXT

### American Railroads in the 19th Century

As America spread west in the first half of the 19th century, its frontier expanded from the Mississippi River to the coast of California and the Oregon Territory.  Access to the great expanses of the prairies and mountains, as well as to the states and territories on the Pacific Coast, was necessary.  The country was young and did not have a lot of money.  But it had lots of land.  Beginning in approximately 1850, Congress embarked upon a policy of subsidizing railroad construction by paying for it with "lavish grants from the public domain."  (*Great Northern Ry. Co. v. U.S.* (1942) 315 U.S. 262, 273 (*Great Northern*).)  With the onset of the Civil War, the need for a transcontinental railroad took on particular urgency, and the ability to reach the west coast over land was considered a military necessity.  President Abraham Lincoln signed the Pacific Railroad Act on July 1, 1862 (ch. 120, §§ 1-20, 12 Stat. 489), and subsequent acts were signed by him and his successors.  These initial "Congressional Acts" granted vast areas of land to several transcontinental railroads, encouraging them to build tracks across the nation.  Some of the land was transferred to the railroads as their own property, to sell and finance their progress in

4

constructing and running the railroad. Other parts were granted as rights-of-way over the surface upon which to build tracks and related structures.[2]

While the early grants were "lavish"—after all, vast areas of land owned by the federal government were given to private companies—they did have strings attached. For example, if a railroad ceased to use the land for railroad purposes, it would revert to the government (or to its grantees, if any). (*Northern Pacific Ry. v. Townsend* (1903) 190 U.S. 267, 271 (*Townsend*).) The government was also concerned about losing potential wealth below the surface upon which the rails would be built. In the initial act of 1862, there was an express exception for "all mineral lands" (other than timber, which was granted to the railroad company). (Pacific Railroad Act of 1862, ch. 120, § 3, 12 Stat. 489.) In late 1862, a report from the Secretary of the Interior out of the General Land Office extolled the great potential wealth expected to be found in the western mineral lands. (U.S. Dept. of Interior, Abstract from the 1862 Annual Report of the Commissioner of the General Land Office (Nov. 29, 1862).) It is clear from this report that the Secretary considered this subsurface wealth in the public lands to be the property of the United States. In 1864, the second major railroad act was enacted. (Act of July 2, 1864, ch. 216, § 1-22, 13 Stat. 356.) It amended the Pacific Railroad Act of 1862, providing land grants to the railroads, reiterating that the government retained rights to the "mineral lands," with the exception of coal and iron (which obviously, along with timber, were major components of railroad construction). In 1866, Congress passed a law providing that "[i]n all cases lands valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law." (30 U.S.C. § 21.)

In the same year that he signed the Pacific Railroad Act of 1862, President Lincoln signed the Homestead Act (Ch. 75, §§ 1-8, 12 Stat. 392), which granted large swaths of land to settlers, who owned and developed the land near, and with the help of, the railroads. The

---

[2]   A checkerboard pattern was utilized, where odd numbered parcels were granted to the railroads as their property, to sell and finance their venture. As to the even numbered parcels, the railroads were granted a right-of-way "through the public lands . . . for the construction of [the] railroad . . . ." (Pacific Railroad Act of 1862, ch. 120, §§ 2, 3, 12 Stat. 489.)

laws to encourage construction of the railroads and foster the infusion of settlers brought results, and the entire project was a success. (*United States v. Union Pacific R. Co.* (1957) 353 U.S. 112, 126-127 (*Union Pacific*) (dis. opn. of Frankfurter, J.).) On May 10, 1869, the Union Pacific and Central Pacific Railroads drove the last spike at Promontory Summit, Utah Territory, completing the first Transcontinental Railroad and connecting America's east and west coasts.

By then, the Civil War had ended. Public sentiment soon turned, and the mood of uncritical enthusiasm toward railroad enterprises began to veer. (*Union Pacific*, *supra*, 353 U.S. at pp. 126-127.) The largesse of land granted to the railroads was seen as a massive government giveaway. By the 1870's, legislators across the political spectrum had embraced a policy of reserving public lands for settlers rather than granting them to railroads. (*Brandt Revocable Trust v. United States* (Mar. 10, 2014, No. 12-1173) ___ U.S. ___ [134 S.Ct. 1257] (*Brandt*).) However, there was still a need to provide the railroads with the ability to complete the massive project, and Congress passed the General Right-of-Way Act of 1875.[3] (18 Stat. 482, 43 U.S.C. § 934 et seq.) Like the earlier acts in the 1860's, this legislation provided the railroads with a right-of-way through the public lands for the construction of a railroad. (*Ibid.*) But now Congress made it clear that it was providing the railroads with "mere easements" over the land on which they could lay their tracks and run their trains. (*Brandt, supra*, at p. 1264, citing *Great Northern, supra*, 315 U.S. at p. 271.) They were given no fee interest in the property itself (*ibid.*); rather, title remained in the federal government. (*Great Northern, supra*, at p. 275, fn. 13.)

Eventually, the need for rail service diminished with the advent of the internal combustion engine as cars and trucks appeared on the landscape. Railroads sold,

---

[3]     After the General Right-of-Way Act of 1875 (formerly reflected in 43 U.S.C. §§ 934-939) was enacted, several other rights-of-way acts were passed relating to railroads. (See, e.g., 43 U.S.C. former § 942 & §§ 943-945.) None of these acts conveyed a greater interest in the property than the 1875 Acts. For convenience, and to be consistent with the terms used in the case law, when referring to the "1875 Act" we mean the right-of-way acts of 1875 and beyond (even if enacted after the turn of the 20th century). And when referring to the "pre-1871 Acts" we mean the earlier land grant acts.

abandoned, or discontinued much of their tracks as their need for the rights-of-way granted by Congress diminished. In response, Congress enacted laws governing the disposition of abandoned or forfeited railroad rights-of-way, which provided that any transfer would "be subject to and contain reservations in favor of the United States of all oil, gas, and other materials in the land." (43 U.S.C. § 912.) Pipelines appeared on the scene, carrying oil, gas, coal slurry and other fuels. Congress passed laws governing subsurface oil and gas pipelines through federal lands, providing for annual rental payments to the government. (See, e.g., 30 U.S.C. § 185 et. seq.) Consistent with its practice of retaining the value of the subsurface to the United States, Congress passed a law providing that the government could grant leases for oil and gas deposits "in or under lands embraced in railroad or other rights of way acquired under any law of the United States, whether the same be a base fee or mere easement . . . ." (30 U.S.C. § 301 et. seq.)

By this time, a hodge-podge patchwork of easements and ownership interests in railroad rights-of-way had spread across the west. As one might imagine, disputes over the rights of railroads, landowners, and the government arose, resulting in numerous federal and state lawsuits and appellate decisions, as well as several landmark opinions from the United States Supreme Court. Many of the cases dealt with the rights to the subsurface beneath the railroads' rights-of-way, and many dealt with ownership rights once the rights-of-way were no longer used for railroad purposes. Both issues arise in the instant case.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.     Railroad Grants Pipeline Easements Beginning in the 1950's

The Pipeline owns approximately 1,871 miles of pipeline running through California, Arizona, Nevada, New Mexico, Texas and Oregon within the Railroad's right-of-way. Another 1,400 miles or so of the pipeline veer off intermittently into public and private lands. In all, there are 1,076 pipeline segments. Some are continuous, some are not. (*Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.* (Mar. 23, 2005, A103990) [nonpub. opn.] (*Santa Fe II*).)

7

In the mid-1950's, the Railroad and the Pipeline were sister subsidiaries of Southern Pacific Corporation. The Railroad possessed a valuable transportation corridor along the rights-of-way granted to it initially by acts of Congress. The Pipeline wished to obtain a longitudinal easement through which to run its pipelines, which carried petroleum products. The two sister companies entered into master agreements in 1955 and 1956 wherein the Railroad rented portions of the subsurface under its rights-of-way to the Pipeline.

By that time, there had been considerable litigation, mostly in federal courts, regarding who owned the subsurface beneath a railroad's right-of-way. As to the 1875 Act, it had been decided by the United States Supreme Court that railroads merely had an easement over the surface of the land, and that title to the subsurface remained in the federal government (or its grantee, if any). (*Great Northern, supra*, 315 U.S. at p. 275.) But as to the pre-1871 Acts, the issue was unresolved. Railroads took the position that they had been given the land itself, and therefore could do what they liked with the subsurface. The federal government disagreed. It sued the Union Pacific Railroad Company, seeking to enjoin it from extracting oil and gas from the subsurface under a pre-1871 right-of-way. In 1954, a federal district court found in favor of the Railroad, holding that it had full rights to the subsurface and refusing to enjoin its use for the Railroad's benefit. (*United States v. Union Pacific Railroad Company* (D.Wyo. 1954) 126 F.Supp. 646.) In 1956, the 10th Circuit United States Court of Appeals affirmed the district court's ruling that railroads owned the subsurface and that it could extract oil and gas from it. (*United States v. Union Pacific Railroad Company* (10th Cir. 1956) 230 F.2d 690.)

In that same year, an in-house attorney for the Railroad's predecessor sent a letter to the Pipeline explaining that the Railroad appeared to have the right to grant pipeline easements in the subsurface under rights-of-way it obtained via the pre-1871 Acts. But since the 1875 Act provided only an easement, they would have to obtain consent from the adjoining landowner in order to use the subsurface for a pipeline.

However, in 1957 the United States Supreme Court issued its seminal opinion in *Union Pacific, supra*, 353 U.S. 112. The court held that, while under the pre-1871 Acts a railroad was entitled to full use of the surface of the land, it could only use the subsurface

8

"'for railroad purposes.'" (*Id*. at p. 114, fn. 1.) Since the extraction of minerals from the subsurface was not a railroad purpose, and was expressly reserved in the statute, the pre-1871 Acts did not provide a railroad with the right to do so. (*Union Pacific*, at pp. 114-115.) The lower court's ruling was reversed, and the government's request that the Railroad be enjoined from extracting minerals from the subsurface was granted. (*Id.* at p. 120.)

Despite this narrowing of a railroad's rights to the subsurface underlying its rights-of-way, the sister companies went forward with their pipeline plan. Leases of pipeline easements proceeded in earnest in late 1957. Over the following years and decades, easements were granted and pipelines were built underneath the Railroad's rights-of-way—those acquired under both the pre-1871 Acts and the 1875 Act—but not without concern on the Railroad's part.

In one 1973 letter, an in-house attorney for the Railroad acknowledged that recent federal court decisions bearing on "the extent of the rights granted to Railroad under the March 3, 1871 Act now appear to be more restrictive as to use of the right-of-way for other than railroad purposes . . ." than previously believed. In a similar 1974 letter, the attorney wrote regarding a proposed pipeline easement in Contra Costa County, saying, "[n]o assurance can be given Railroad is entitled to grant the pipeline easement in view of the unfavorable trend of California decisions interpreting grants to railroad companies." Another letter by the same in-house attorney written in 1976 discusses the fact that upon abandonment of rail operations the limited title properties may result in reversion of title, and that the easements are subject to loss upon abandonment for railroad purposes. It concludes that "consideration need [*sic*] be given as to the advisability of granting to [the Pipeline] an easement for pipelines in the property classified as limited title and easement for railroad purposes . . . unless it is feasible for Railroad to take steps necessary to establish that it is the fee owner of the right of way in which [the] pipeline is located." Nevertheless, the Railroad continued to grant easements to the Pipeline.

In 1983, during discussions among the related entities regarding mergers, the Railroad and the Pipeline entered into a new master agreement addressing the easements.

## II. Merger of Parent Companies: The Sister Companies Part Ways and Litigation Begins

The new 1983 master agreement between the two companies revised the arrangement regarding the Pipeline's perpetual, nonexclusive easements, and it set forth the amount of rent to be paid for existing pipeline easements through 1993. Also in 1983, the parent company of the Railroad and the Pipeline announced a merger with Santa Fe Railroad. The combination went forward but the Railroad was held in a trust and remained separate from the other newly combined entities, pending a ruling from the Interstate Commerce Commission (ICC) on the merger. Ultimately, the ICC disapproved of the consolidation of the two railroads and required the Railroad to be sold to a third party.[4] Meanwhile, the pipeline company became Santa Fe Pacific Pipelines, Inc. The Railroad and Pipeline companies were no longer sister subsidiaries.

In 1991 the Railroad sued the Pipeline and related entities, alleging that the 1983 master agreement should be rescinded because it was created while the companies were still sister entities, and, because it was "not negotiated . . . at arm's length," it set artificially low rent for the pipeline easements. The Railroad claimed that some of the Pipeline's facilities and tanks had been dedicated for the Railroad's continued use, "without regard to the technical title-holder of such properties, for its fuel needs." The Railroad also claimed that it should be permitted continued use of those pipeline facilities as if it had an "actual ownership interest."

As the case progressed, the parties entered into a "tolling agreement" to stay the litigation in order to attempt to reach a global settlement of all issues.

## III. Settlement of the 1991 Lawsuit

The parties settled the 1991 lawsuit in April 1994. Pursuant to the settlement agreement, the 1983 master agreement was rescinded; the master agreements of the 1950's were revitalized; the Pipeline's easement rights were confirmed and the easement locations

---

[4] In 1988, the Railroad was purchased by Rio Grande Industries and operated as a subsidiary of that company until 1996, when Union Pacific Railroad Company acquired it.

10

were modified, reducing the width of the easement at many segments. The parties compromised various existing claims. The Pipeline paid over $5.5 million in return for the Railroad's dismissal of claims and causes of action, including those related to the Pipeline facilities allegedly dedicated for the Railroad's own use. The new settlement agreement contained no provision for the Railroad's use of the Pipeline's facilities for its own fuel needs.

As to future rent, the settlement agreement provided as follows: 'Beginning January 1, 1994, and every ten (10) years thereafter, [the Railroad] may seek an increase of rent to fair market value. . . ." If the parties could not agree, they would stipulate to an order for judicial reference pursuant to Code of Civil Procedure section 638.

In July 1994, the parties entered into an amended and restated easement agreement (AREA), which reflected that the Railroad granted easements to the Pipeline for the conveyance of petroleum or natural gas, coal slurries, etc., "in, upon, along and across the property of [the] Railroad." The AREA reiterated the procedure and mechanism for determining rent increases set forth in the prior settlement agreement. In September 1994, the parties also entered into a side letter agreement addressing some outstanding issues. The letter agreement provided, among other things, that "all Existing Easement Agreements shall be amended and restated pursuant to the terms of the [AREA]" and that all future easements would be recorded.[5] It also provided that during the pendency of any reference proceeding or appeal regarding the rent, the Pipeline would continue to pay rent at the previous rate, subject to consumer price index adjustments, until resolution of the dispute.

## IV.    The 1994 Case

On August 31, 1994, the Railroad filed an action for declaratory relief when efforts to agree on a new rental amount failed. The parties proceeded by way of a temporary judge pursuant to California Constitution, article VI, section 21, rather than by way of the referee called for in the AREA. At trial, the Pipeline argued that the Railroad did not have a fee interest in its rights-of-way, since they were largely derived from the 19th century

---

[5]    The original agreements in the 1950's called for the easements not to be recorded.

11

Congressional Acts. The Railroad brought a motion in limine to preclude any evidence regarding its title. The motion was granted and the Pipeline was prevented from proving that its easements did not, in fact, run through the "property of the railroad." Although it excluded evidence of the Railroad's property interest, the trial court nevertheless "assume[d] that the [R]ailroad own[ed] a fee interest." At the same time, it said that "the court makes no determination as to whether in fact or in law the [R]ailroad owns a fee interest or, as [the Pipeline] contends, it owns a lesser legal, and thus lesser valued, interest."

Judgment was entered in May 1997 in the approximate amount of $5 million base annual rent as of January 1994.[6] The Railroad appealed and the judgment was reversed two years later in *Sante Fe I, supra*, 74 Cal.App.4th 1232 on the grounds that the trial court refused to admit expert evidence regarding the Railroad's valuation methods and techniques. The case was tried a second time to the same temporary judge, who then entered judgment for roughly the same amount in July 2003. The Railroad appealed again. This time the judgment was affirmed in 2005 (with one minor exception) in *Santa Fe II, supra*, A103990. After the Railroad sought prejudgment interest, which the temporary judge granted, another appeal followed. The Court of Appeal did not reach the merits of the prejudgment interest issue, but reversed the order on grounds that the request had been untimely. (*Santa Fe Pacific Pipelines, Inc. v. Superior Court* (July 26, 2006, A113858) [nonpub. opn.] (*Santa Fe III*).) After that, the 1994 litigation finally ended. In the meantime, however, the 2004 litigation had begun.

## V. The Instant 2004 Case

### A. The Trial

The next stage of this litigation commenced in 2004. Efforts to agree on the amount of the annual rent increase were made in late 2003, but again failed. In July 2004, the Railroad filed a complaint for declaratory relief. The complaint sought another 10-year

---

[6] This court takes judicial notice of the May 12, 1997 judgment appealed from in *Southern Pacific Transportation Company v. Santa Fe Pacific Pipelines, Inc.* (1999) 74 Cal.App.4th 1232 (*Santa Fe I*), pursuant to the request of the Pipeline.

increase in rent to fair market value on easements "within [the Railroad's] right-of-way property" pursuant to the AREA.

In March 2005, the parties stipulated to the appointment of the Honorable Eli Chernow, Judge (retired), to serve as a temporary judge under California Constitution, article VI, section 21. Trial commenced in February 2007. The Railroad again brought a motion in limine to exclude evidence regarding its title, on the grounds that such evidence was irrelevant to the sole issue in the case—i.e., the amount of rent due for the easements. This time, the motion was denied. Later in the trial, the Railroad brought a motion to strike evidence regarding the status of its title, which also was denied.

During trial, the Pipeline brought a cross-complaint against the Railroad regarding properties in which the Railroad had conveyed its interests to third parties but still continued to collect rent from the Pipeline. The Railroad brought its own cross-complaint regarding the Pipeline's failure to pay rent on certain properties the Pipeline had abandoned. At the close of the Railroad's case-in-chief, the Pipeline brought a motion for judgment pursuant to Code of Civil Procedure section 631.8 on the grounds that the Railroad had not introduced sufficient evidence of ownership of the land underlying its rights-of-way to prove its case. After hearing argument, the trial court suggested that the Railroad reopen in order to address ownership issues. A substantial amount of testimony was then heard and documentary evidence was received regarding the nature of the Railroad's ownership interest of the land in question. Knowledgeable persons with expertise in railroad title and the Congressional Acts testified. Ultimately, the Pipeline's motion for judgment was denied.

In April 2012, after more than 250 trial days, the trial court issued a comprehensive 105-page statement of decision. Judgment was entered on May 30, 2012. Concluding that the Railroad had sufficient property interests in all of the land beneath its rights-of-way to allow it to collect rent from the Pipeline, the court found that pursuant to the AREA the base annual rent commencing on January 1, 2004, was $14,080,487; "back rent" due as of the time of judgment was $81,589,584; and prejudgment interest payable by the Pipeline to the Railroad was $19,372,195.50. The court also ruled in the Railroad's favor on both cross-complaints.

13

## B.       The Trial Court's Rulings re "Property of the Railroad"

In various motions and pleadings, the Pipeline challenged the Railroad's title to the land through which its easements ran—i.e., the "subject property."[7] Witnesses testified about the pre-1871 and 1875 Congressional Acts. Title cards prepared by the Railroad were presented, delineating which acts granted each right-of-way, and also noting if the right-of-way had been acquired from different sources. The Pipeline demonstrated that in many cases the Railroad did not own the property in fee, and therefore claimed it had not met its burden to prove a key element of its case—i.e., that rent was due for easements within the property of the railroad. The Railroad did not prove otherwise; rather, the thrust of its counter-argument was that it did not have to prove title. It could collect the rent regardless of who owned the property, because the Pipeline had the easements and had agreed to pay rent to the Railroad for them. In other words, it did not have to prove the "property of the railroad" was the Railroad's property.

After hearing evidence relating to the Congressional Acts and testimony about the title cards, the trial court noted that the records "most commonly showed that [the Railroad] originally acquired title through one or more land grants under certain Acts of Congress." Other parcels were acquired "by grant[s] from states or other grantors." The court also noted that "[i]t is undisputed that much of the property held by the [R]ailroad is held in less than full fee ownership" and that the Railroad "did not offer direct evidence of its title to the Subject Property." But there is little indication that the trial court considered in detail the application of the Congressional Acts, or the case law promulgated under them, in determining the nature of the Railroad's property interest.

Instead, the trial court believed it was "not dealing with a situation in which evidence has been presented that some third party is the owner of title." It stated that there was "no evidence disputing the Railroad's title to virtually all of the subject property." And it

---

[7]       As used by the trial court, the "subject property" refers to the land containing the pipeline easements. The "property of the railroad" is a broader term referring to railroad rights-of-way generally. Thus, the AREA provides that the "subject property" is within the "property of the railroad."

14

concluded that "in the absence of any disputing evidence, the Railroad's ownership has been adequately shown for purposes of this proceeding." The court based its ruling in part on the fact that "no other person or entity has attempted to collect rent for the use of the property" or disturbed the Pipeline's peaceful occupancy, although it implied the situation might be different if a valid claim was raised by a third party entitled to collect the rent.

As discussed below, there are numerous federal and state judicial opinions casting doubt on the rights of railroads to the subsurface underlying their rights-of-way based upon the Congressional Acts. Yet despite the Pipeline's repeated challenges to the Railroad's ownership under these acts, the trial court stated that "no challenge to [the Railroad's] ownership [had] been made by [the Pipeline]" and that "there [was] no evidence disputing the Railroad's title to virtually all of the subject property . . . ." On that basis, the trial court held that "in the absence of evidence challenging the [R]ailroad's title," the Railroad's ownership of the property had been "adequately shown" and (with minor exceptions) it was entitled to rent on the easements.

## C.     The Appeal

The Pipeline timely appealed from the judgment and "all orders and rulings subsumed therein" as well as various postjudgment orders. At oral argument, we asked whether the Railroad had the right to grant the Pipeline's easements in the first instance, given the terms of the Congressional Acts and the extensive relevant case law. When counsel for each side did not appear fully prepared to respond to this inquiry, the court requested supplemental briefing on the subject of the Railroad's property interests.

In its supplemental briefs, the Pipeline claims the Railroad did not have sufficient title to the property to grant the subsurface easements in the first instance.[8] The Railroad claims it did have sufficient title to do so. Both sides discuss the nature of the conveyances

---

[8]     In the interim, the Pipeline has made a motion to augment the record to include documents that had been presented at trial when the question of the Railroad's property rights was being litigated. The Railroad objected to augmentation of the record. Since the additional record bears on the issues raised in the supplemental briefing, and since it contains nothing that has not already been presented to the trial court, the motion to augment the record is granted.

provided by the Congressional Acts. Much of the result turns on the question of what is meant by a "railroad purpose." In reviewing the judgment below, we address and resolve the question of how the Congressional Acts apply to the Pipeline's subsurface easements beneath the Railroad's rights-of-way.

As to the other issues raised on appeal, we affirm the trial court's ruling that the judgment in the 1994 case did not collaterally estop the relitigation of issues raised in that case. However, for the reasons discussed below regarding the outstanding question of the Railroad's property rights, the trial court's rulings as to the calculation of the rent owed, the Railroad's right to collect rent for easements in land that had been sold prior to 1994, and the right of the Railroad to collect prejudgment interest, are reversed and remanded.

## STANDARD OF REVIEW

The multiple issues raised in this appeal call for various standards of review. As to questions of law, such as the construction of the Congressional Acts granting rights-of-way to the railroads, we employ a de novo standard. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432; *Topanga and Victory Partners v. Toghia* (2002) 103 Cal.App.4th 775, 780-781.) We also employ a de novo standard of review regarding the interpretation of contracts and stipulations between the parties where there was no conflicting extrinsic evidence presented at trial. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866.) And we apply the same standard when determining if res judicata and/or collateral estoppel principles apply, in light of the previous trial and judgment in the 1994 case. (*Estate of Kampen* (2011) 201 Cal.App.4th 971, 985.)

As to rulings on the admissibility of evidence, we utilize an abuse of discretion standard. (*Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1111.) And in assessing the trial court's findings of fact, we employ a substantial evidence standard. (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188.)

16

## DISCUSSION

I.  **The Amount of Rent Due to the Railroad for the Pipeline Easements Requires a Determination of the "Property of the Railroad"**

The AREA requires the Pipeline to pay rent to the Railroad on easements running through the property of the Railroad. Since the trial court did not make a factual determination of what the property of the railroad is, we remand the case for the court to make that determination.

A.  **What Is the "Property of the Railroad"?**

This action is based on the AREA, which addresses the easements granted to the Pipeline in, upon, along and across the "property of [the] Railroad." (See, e.g., AREA, para. 1.(a.), p. 2.) The Railroad's complaint alleges that the Pipeline owes rent on its easements within the "[R]ailroad's right-of-way property." It has long been recognized that the word "property" is a term with multiple meanings. (Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning* (1913) 23 Yale L.J. 16, 21.) "Sometimes [the word] is employed to indicate the physical object to which various legal rights, privileges, etc., relate; then again—with far greater discrimination and accuracy—the word is used to denote the legal interest (or aggregate of legal relations) appertaining to such physical object." (*Ibid.*) In other words, the word "property" is sometimes used to refer to the physical parcel of land in question. Other times it refers to the "complex aggregate of rights (or claims), privileges, powers, and immunities" that one has in that parcel of land. (Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning* (1917) 26 Yale L.J. 710, 746.)

"In a strict legal sense, land is not 'property,' but the subject of property. The term 'property,' although in common parlance frequently applied to a tract of land or a chattel, in its legal signification 'means only the rights of the owner in relation to it.' . . . 'Property is the right of any person to possess, use, enjoy, and dispose of a thing.'" (*Eaton v. B. C. & M. R.R.* (1872) 51 N.H. 504, 511; see also *Wynehamer v. People* (1856) 13 N.Y. 378, 433.)

17

Thus, "'"[p]roperty" is more than just the physical thing—the land, the bricks, the mortar—it is also the sum of all the rights and powers incident to ownership of the physical thing. It is the tangible and the intangible. Property is composed of constituent elements and of these elements the right to *use* the physical thing to the exclusion of others is the most essential and beneficial. Without this right all other elements would be of little value . . . .'" (*Dickman v. Commissioner* (1984) 465 U.S. 330, 336.) "A common idiom describes property as a 'bundle of sticks'—a collection of individual rights which, in certain combinations, constitute property." (*United States v. Craft* (2002) 535 U.S. 274, 278.)

Here, the pipelines run through the physical land below the Railroad's rights-of-way. But the "property of the railroad" refers to the rights, privileges, powers and immunities that the Railroad has in the land through which its rights-of-way run. The question here is whether, as of 2004, the Railroad had enough "sticks" to allow it to collect rent on the easements running under its rights-of-way.

The trial court concluded that the Railroad had sufficient property interests to have granted the Pipeline easements and to collect rent on them (even those that the Railroad had sold prior to 1994, when the AREA was executed). On appeal, the Railroad argues that the trial court's ruling should stand, and that this court should not even address the nature of the grants made to it by the federal government. According to the Railroad, this court, like the trial court, should either assume that the Railroad had title to virtually all of the subject property or, alternatively, did not need to prove it in any event.

The Railroad fashions this case as a "private-rights property dispute" and contends it is a based upon a "private rental agreement [that does not] involve any matter of public interest or administration of justice." We reject that characterization. This case is not simply a private matter between two corporations that disagree about the amount of money one owes another in a dispute over private property. Nor is it a lawsuit involving the right of a landowner who purchased real property in the marketplace and seeks to use it as he or she sees fit. Public land was allocated to the railroads by the federal government for a specific purpose—to construct and operate a transcontinental railroad, in order to help protect the nation during civil strife, to expand its frontier, grow its economy, and develop

18

its future.  The land provided by Congress was neither purchased by the railroads nor was it given to them with no strings attached.  Strings were attached.[9]  We must determine whether those strings limit the ability of the Railroad to use the land as a private revenue source.

A concept all too often overlooked in railroad litigation and its judicial opinions is that the grants of rights-of-way to the railroads by Congress were not merely conveyances of land from the government to the railroads so they could build and operate railroads across the continent.  Certainly, they were that.  But they were more.  They were laws.  It has long been recognized that "[a] legislative grant operates as a law as well as a transfer of the property, and has such force as the intent of the legislature requires."  (*Schulenberg v. Harriman* (1874) 88 U.S. (21 Wall.) 44, 62.)  After all, "[w]hen Congress grants a property interest, the grant is both a grant of property *and a law* and Congress is free to specify terms or elements different from those that otherwise would apply either by virtue of the common law or in other statutes.  This fact seems to have been lost in some of the discussions of congressional railroad grants."  (Baldwin & Flynn, Federal Railroad Rights of Way, Congressional Research Service (May 3, 2006) p. 4, italics added.)  "'[W]hile the vocabulary of the common law of real property is often imported into the discussion of railroad rights-of-way, where those rights-of-way have been created by federal law, they are entirely creatures of federal statute, and their scope and duration are determined, not by common law principles, but by the relevant statutory provisions.'"  (*Beres v. United States* (Fed.Cl. 2005) 64 Fed.Cl. 403, 411.)

This is not to say, of course, that common law principles have no role to play.  Indeed, in the end they may ultimately be determinative.  (See, e.g., *Brandt, supra*, 134 S.Ct. at p. 1266.)  But it does mean that traditional common law principles must be applied, and sometimes modified, in the context of congressional enactments bearing on the property in question.  We are required to take judicial notice of the statutory and decisional law of California and of the United States.  (Evid. Code, §§ 451, 459.)  Numerous statutes and abundant case law address the question of who owns the land underlying railroads' rights-

---

[9]     Or, put another way, sticks were withheld.

of-way. Notwithstanding the Railroad's argument that we should avoid the issue, this body of law must be considered and applied here in order to determine what the "property of the railroad" is.[10]

The initial enabling statutes passed by Congress have given rise to numerous ownership questions over the years. As stated by the United States Supreme Court in *Leo Sheep Co. v. United States* (1979) 440 U.S. 668, quoting a much earlier case, "'The solution of [ownership] questions [involving the railroad grants] depends, of course, upon the construction given to the acts making the grants; and they are to receive such construction as will carry out the intent of Congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance.'" (*Id.* at p. 682, quoting *Winona & St. Peter RR. Co. v. Barney* (1885) 113 U.S. 618, 625 (*Winona*).)

In the instant case, the trial court does not explain its analysis of the Congressional Acts, nor how that analysis led to its conclusion that the Railroad had adequate ownership interests to charge rent for the Pipeline's easements. As the trial court did in the 1994 case, the trial court here essentially decided not to decide what the "property of the railroad" was. Instead, it appears to have taken a tack similar to that employed by expert witnesses at trial, who expressed their opinions based upon the assumption that the Railroad had a fee interest in the land, and thus sufficient ownership to grant and collect rent on the subsurface easements. But in the face of 150 years of federal and state jurisprudence that define and delineate the nature of railroad rights-of-way vis-à-vis the rights of the federal government and adjacent landowners, that is insufficient. Without an analysis of the Congressional Acts

---

[10] The Railroad attached to its supplemental brief a Department of the Interior memorandum of January 5, 1989, saying that in order to determine the scope of the Railroad's right to permit subsurface installations, "it is necessary to examine the statutory terms of [the Railroad's] rights-of-way grants. . . . Then we must turn to the Supreme Court and lower court authority interpreting the scope of the railroad rights-of-way." (Proposed Installation of MCI Fiber Optic Communications Line Within Southern Pacific Transportation Co.'s Railroad Right-of-Way (Jan. 5, 1989, M-36964) 96 I.D. 439.) No less is required of our analysis here.

20

and their application to the facts presented, one cannot resolve the ownership questions at the heart of this case.[11]

**B. Did the Congressional Acts Granting Rights-of-Way to the Transcontinental Railroads Give Them the Right to Rent the Subsurface to Private Third Parties for Use as a Pipeline?**

The Congressional Acts were passed in order to effectuate construction of a transcontinental railroad (*Beres v. United States, supra*, 64 Fed.Cl. at p. 410), but they used two different mechanisms to accomplish their goal: The initial "land grant" statutes before 1871, and the subsequent "easement" statutes from 1875 and beyond. Since the nature, scope, and extent of these enactments differ significantly, we address them separately.

1. *The 1875 Act Did Not Provide the Railroad with Sufficient Property Interests to Justify Its Collecting Rent on the Pipeline's Subsurface Easements*

With the 1875 Act, the railroads obtained a "mere easement[]" over the land, which otherwise remained the property of the owner of the servient estate. This issue was addressed and confirmed in the recent case of *Brandt, supra*, 134 S.Ct. 1257. There, the United States Supreme Court pointed out that the act itself used language that was "'wholly inconsistent with the grant of a fee interest.'" (*Id.* at p. 1264.) Congress provided that "all such lands over which such right of way shall pass shall be disposed of subject to such right of way." (43 U.S.C. § 937.) As the United States Supreme Court stated, "'[a]pter words to indicate the intent to convey an easement would be difficult to find.'" (*Great Northern, supra*, 315 U.S. at p. 271.) In light of the conclusion that the railroad had a mere easement, the court then applied traditional common law principles to find that, when the beneficiary

---

[11] Contrary to the Railroad's contention, we do not raise these questions sua sponte, nor has the Pipeline waived its claims regarding this issue. Challenges to the Railroad's property rights were raised again and again at trial by the Pipeline. The record is replete with pleadings, motions, and arguments addressing the nature of the Railroad's rights-of-way as granted by the Congressional Acts. The trial court's conclusions regarding title are reflected in its multiple rulings and its statement of decision, which are encompassed by the Pipeline's notice of appeal.

21

of an easement ceases to use it for its intended purpose, it disappears and the owner of the servient estate (i.e., the federal government or its grantee) resumes full and unencumbered interest in the land. (*Brandt, supra*, at p. 1265.)

Much of the analysis in *Brandt* was based upon an earlier case, which dealt directly with the use of the subsurface underlying a railroad right of way. In *Great Northern*, a railroad sought to drill for and remove gas, oil and other minerals from beneath its right-of-way, which it had obtained through the 1875 Act. The United States Supreme Court pointed out that Congress had merely granted an encumbrance upon the land, but no actual land to the railroad company.[12] (*Great Northern, supra*, 315 U.S. at p. 272.) The court made it

---

[12] During the debate on the General Right-of-Way Act of 1875, Senator Stewart of Nevada stated, "If [railroad companies] do not build a railroad and do not use [the easement] for that purpose, they do not have it at all. The title is for this purpose." (Remarks of Sen. Stewart, 2 Cong. Rec. 2900 (1874); see *Geneva Rock Products, Inc. v. United States* (2012) 107 Fed.Cl. 166, 171-172.)

"In explaining why the House Public Lands Committee had inserted a clause similar to § 4 of the 1875 Act in a special right of way bill considered in 1872, Congressman Slater stated:

"'The point is simply this: the land over which this right of way passes is to be sold subject to the right of way. It simply provides that this right of way shall be an incumbrance upon the land . . . ; that those who may afterward make locations for settlement shall not interfere with this right of way.

"'Mr. Speer, of Pennsylvania. It grants no land to any railroad company?

"'Mr. Slater. No, sir.' Cong. Globe, 42d Cong., 2d Sess. 2137.

"And in the House debate on the 1875 Act itself, Congressman Hawley said:

"'It simply and only gives the right of way. It merely grants to such railroad companies as may be chartered the right to lay their tracks and run their trains over the public lands; it does nothing more.' 3 Cong. Rec. 407.

"The earliest administrative construction of the 1875 Act plainly stated that the railroad received an easement rather than a fee. The Land Department Circular of January 13, 1888, said:

"'The act of March, 3, 1875, [*sic*] is not in the nature of a grant of lands; it does not convey an estate in fee, either in the 'right of way' or the grounds selected for depot purposes. It is a right of use only, the title still remaining in the United States.' 12 L.D. 423, 428." (*Union Pacific, supra*, 353 U.S. at p. 129 (dis. opn. of Frankfurter, J.).)

clear that with the 1875 Acts title to the land remained in the federal government. (*Id.* at p. 275.) Since the act granted only an easement, but no title to the subsurface lying in the servient estate, the railroad "had no right to the underlying oil and minerals." (*Id.* at p. 279.) Put another way, the federal government gave the railroad the right to use the surface of the land to construct and operate its railroad, but it did not give it the right to extract value from the subsurface, which was still owned by the federal government (or, later, its grantees).

The Railroad here argues to the contrary, claiming that the 1875 Act granted it far more than a simple easement. It argues in its supplemental briefs that the 1875 Acts authorized the Railroad "to conduct . . . all activities on the surface or subsurface of the property" that derive from or further a railroad purpose. However, the Railroad has cited no case holding that the 1875 Act allowed "all activities [in the] subsurface," whether derived from or furthering a railroad purpose or not.

On the other hand, to consider the right-of-way provided by the 1875 Act as an old-fashioned common law easement is not accurate. While *Brandt* made clear that the right-of-way is a mere easement for purposes of what happens when it is no longer used by the railroad, and that it is a surface easement passing *over* the land of another (*Brandt, supra*, 134 S.Ct. at p. 1262), cases have recognized that even under the 1875 Act railroads obtained more than a traditional easement at common law.[13] From the beginning, courts have recognized the unique aspect of a railroad right-of-way. As noted early on by the United States Supreme Court (when discussing a right-of-way under an 1866 land grant), "[a] railroad right of way is a very substantial thing. It is more than a mere right of passage. It is more than an easement." (*Western Union Tel. Co. v. Penn. R. R.* (1904) 195 U.S. 540, 570 (*Western Union*).) It is an "interest in the land, special and exclusive in its nature." (*Ibid.*) In distinguishing a railroad right-of-way from an easement at common law—which was

---

[13]    Certainly, *Brandt* appears to describe the 1875 Act under traditional property law as a "'nonpossessory right to enter and use land in the possession of another.'" (*Brandt, supra*, 134 S.Ct. at p. 1265.) But *Brandt* was addressing a circumstance where the railroad had abandoned its right-of-way. There was no issue of the railroad's rights while the land was being still used to run its trains.

considered a nonpossessory and incorporeal interest in property—the court referred to *New Mexico v. United States Trust Co.* (1898) 172 U.S. 171, which stated that if a railroad right-of-way was an easement it was "one having the attributes of the fee, perpetuity and exclusive use and possession; also the remedies of the fee, and, like it, corporeal, not incorporeal, property." (*Id.* at p. 183.)

State courts also contributed to the lexicon of railroad rights-of-way. The Iowa Supreme Court opined that "[t]he easement is not that spoken of in the old law books, but is peculiar to the use of a railroad, which is usually a permanent improvement, a perpetual highway of travel and commerce . . . ." (*Smith v. Hall* (1897) 72 N.W. 427, 428.) Thus, a railroad right-of-way, whether called an easement or not, is different than "a medieval right of way that authorized merely taking horses or wagons across a field" owned by someone else. (*Home on the Range v. AT&T Corp.* (2005) 386 F.Supp.2d 999, 1014 (*Home on the Range*).)

Early on—before the days when subsurface pipelines were even feasible—courts also recognized there was a difference between the surface and subsurface. In *Western Union*, the United States Supreme Court extolled the substantiality of the railroad rights-of-way, but nevertheless opined that they were simply a "'fee in the surface and so much beneath as may be necessary for support.'" (*Western Union, supra*, 195 U.S. at p. 570, citing *Pennsylvania Schuylkill Valley R.R. Co. v. Reading Paper Mills* (Pa. 1892) 24 A. 205.) Thus, the land underneath the surface is not necessary for the railroad, except as a physical foundation. "'"[O]rdinarily the fee is of little or no value unless the land is underlaid by a quarry or mine."'" (*San Gabriel v. Pacific Elec. Ry. Co.* (1933) 129 Cal.App. 460, 464.) It is the distinction between the surface and the subsurface that the Railroad obscures here. But this distinction makes a difference when it comes to using the land underlying the right-of-way.

A railroad easement may be a "substantial thing" that is more than a traditional nonpossessory, incorporeal interest in land. After all, a "railroad company . . . acquires more than the mere right of passage over [the] land[,] [i]t acquires the right to excavate drainage ditches; to construct beneath the surface supports for bridges and other structures; to erect and maintain telegraph lines and supporting poles with part of the poles beneath the

24

surface; to construct passenger and freight depots, using portions of the land below them for foundations; to construct signals; to make fills and cuts to decrease the grades of their rail lines, and to use material from the land covered by the right of way to make such fills; and to construct a roadbed and lay its ties and the rails thereon. Hence, it has substantial surface and subsurface rights, which it is entitled to have protected." (*Kansas City South. Ry. Co. v. Arkansas Louisiana Gas Co.* (1973) 476 F.2d 829, 834-835 (*Kansas City*).) The 1875 Act granted more than a "mere" easement, if that term is used to mean an old-fashioned, temporary passageway that is incorporeal in nature. To operate its trains, a railroad needs, and has, more than that.

But all of the above functions and needs of the railroad are for the purpose of constructing and running the railroad itself. As the *Kansas City* court pointed out, those things "cannot deprive the owner of the servient estate . . . from making use of the land in strata below the surface and below substrata which are used or needed by the railroad company, and which in no wise . . . interferes with the construction, maintenance and operation of the railroad." (*Kansas City, supra*, 476 F.2d at p. 835.) Thus, in that case, it was the owner of the servient estate—not the railroad—that had the right to build a pipeline below the railroad's right-of-way.

As to rights-of-way granted by Congress in 1875 and beyond, the Railroad has exclusive rights to the surface and, in addition, "broad and extensive rights of sub-lateral and subjacent support to prohibit interference with railroad operations and maintenance." (*Energy Transp. Systems, Inc. v. U. Pac. R. Co.* (D.Wyo. 1977) 435 F.Supp. 313, 317 (*Energy Transp. I*); see *Home on the Range, supra*, 386 F.Supp.2d at p. 1013.) However, the subsurface must be used to support the construction or operation of the railroad (i.e, for railroad purposes). Under the 1875 Act, the railroads "did not own [and] could not dedicate or grant any part . . ." of their right-of-way (*Himonas v. Denver & R. G. W. R. Co.* (10 Cir. 1949) 179 F.2d 171, 172.), nor could they "grant any part of [their] right of way for private use . . . ." (*Id.* at p. 173.)

California cases are in accord. In *Atchison, T. & S.F. Ry. Co. v. Abar* (1969) 275 Cal.App.2d 456 (*Atchison*), a private fee owner granted an easement over his property to a

railroad company in order to build and operate its railroad.  (*Id.* at pp. 458-459.)  Decades later, the railroad expanded its operation to include a "team track."[14]  While the grant creating the easement provided for switches and turnouts, it did not provide for team tracks.  (*Ibid.*)  Applying California law, the Court of Appeal said that "[w]here an easement is founded upon a grant, only those interests expressed in the grant and those necessarily incident thereto pass from the owner of the fee."  (*Id.* at p. 464.)  The court pointed out that "[t]he scope of an easement is determined by the terms of its grant," citing Civil Code section 806.[15]  Thus, the easement holder's use is "limited by the requirement that it be reasonably necessary and consistent with the purposes for which the easement was granted." (*Atchison*, at p. 464.)

Even though the team track was involved with railroad operations and functioned in conjunction with its trains, it was beyond any use encompassed by the grant.  An easement holder's use must be consistent with "'normal future development within the scope of the basic purpose [citations], but not an abnormal development, one which actually increases the burden upon the servient tenement. . . .'"  (*Atchison, supra*, 275 Cal.App.2d at p. 464.) Holding that the team track was not permitted, the *Atchison* court explained that "[s]o long as an easement exists, both parties have the right to insist that it shall remain substantially the same as it was when granted . . . ."  (*Id.* at p. 465.)  In the instant case, a subsurface petroleum pipeline is clearly an "abnormal development" not encompassed by the original grant, which increases the burden on the servient tenement.  "'California courts have set their faces firmly against such increases in the burden upon the servient tenement.'"  (*Id.* at pp. 464-465.)

---

[14]     A "team track" consists of railroad tracks that are used to switch railroad cars off the main line for the purpose of storing them, in order to allow the owner of the freight to unload it from a team driveway with vehicular access.  (*Atchison, supra*, 275 Cal.App.2d at pp. 460-461.)

[15]     Civil Code section 806 states:  "The extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired."

To summarize, the railroad's rights to the land underneath its rights-of-way granted by the 1875 Act were limited to what was necessary to support the railroad itself. Otherwise, the rights to the subsurface remained with the owner of the servient estate. Put another way, the 1875 Act granted the Railroad substantial rights to the surface of the land over which it operates its trains, but it did not make the subsurface the "property of the railroad."

Therefore, the Railroad's right to collect rent from the Pipeline for use of its subsurface easements cannot be based solely on acquisitions obtained via the 1875 Act or its progeny.

2. *The Pre-1871 Acts Did Not Provide the Railroad with Sufficient Property Interests to Justify Its Collecting Rent on the Pipeline's Subsurface Easements*

a. Under the pre-1871 Acts, railroads were required to use their rights-of-way for railroad purposes only

A railroad's rights to the lands granted to them in the pre-1871 Acts raise different issues than those raised in the 1875 Act. Rather than a simple easement along the surface, railroads were actually given an estate in the land. (For example, the Pacific Railroad Act of 1862 provides that "there be, and is hereby, granted to the said company, for the purpose of aiding in the construction of said railroad . . . every alternate section of public land, designated by odd numbers" [all mineral lands excepted, other than timber].) (Ch. 120, § 3, 12 Stat. 489.) Under the Act of July 2, 1864, the railroads could condemn land "necessary for the construction of its road" and thereby "acquire full title to the same for purposes aforesaid." (Ch. 216, § 3, 13 Stat. 356.) However, the land grants had strings attached. The railroads were not given full fee title. The land had to be used for the "legitimate purposes of the railroad," and there was an "implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted." (*Townsend, supra*, 190 U.S. at p. 271.) Thus arose the term "limited fee" when referring to rights-of-way under the pre-1871 Acts. (*Townsend*, at p. 271.)

27

While the Railroad here cites *Townsend*'s "limited fee" language frequently, that case does not stand for the proposition that the railroad could do whatever it wanted with the land, both surface and subsurface, as if it was owned in fee. As *Townsend* itself explained, "[t]he substantial consideration inducing the grant was the perpetual use of the land for the legitimate purposes of the railroad," and it belonged to the railroad only "so long as it was used for the railroad right of way." (*Townsend, supra*, 190 U.S. at p. 271.) Thus, even in the pre-1871 cases, Congress never conveyed to the railroads full title to the land, to do with it as they pleased.

The landmark 1957 United States Supreme Court decision in *Union Pacific*, bears this out. Referring to the pre-1871 Acts, the court confirmed that a railroad's right-of-way was granted for "'the construction of [a] railroad and telegraph line.'" (*Union Pacific, supra*, 353 U.S. at p. 114, citing the Pacific Railroad Act of 1862, ch. 120, § 2, 12 Stat. 489.) As the high court explained, "[t]hat purpose is not fulfilled when the right of way is used for other purposes." (*Ibid*.) Citing *Townsend*, the court said that "whatever may be the nature of Union Pacific's interest in the right of way, drilling for oil on or under it is not a railroad purpose within the meaning of . . . the Act." (*Union Pacific, supra*, at p. 114.) Referring to the "limited fee" concept that *Townsend* coined, the court opined that "[t]he most that the 'limited fee' cases decided was that the railroads received all *surface* rights to the right of way and all rights incident to a use *for railroad purposes*." (*Union Pacific*, at p. 119, italics added.) Subsequent federal courts have recognized that the "limited fee" concept was "severely cut back in . . . *Union Pacific*[*, supra*,] 353 U.S. 112." (*Energy Transp. Systems, Inc. v. U. Pac. R. Co*. (10th Cir. 1979) 606 F.2d 934, 936 (*Energy Transp. II*).)

Nevertheless, in the instant case the Railroad contends that as to the pre-1871 Acts, it "owns the land (except the mineral estate) in 'fee,' subject only to rights of reversion."[16] As

---

[16]     The Railroad also contends that *Brandt* confirmed the holding in *Townsend*. But *Brandt* merely discusses *Townsend* as part of the evolution of the rights-of-way cases involving pre-1871 Acts, on its way to pointing out that it was not applicable to the case before it—which involved an 1875 Act easement. Nothing in *Brandt* implies that the court

noted above, this misconstrues the law. *Townsend* did not say the railroad could do whatever it wanted with the land until reversion occurred. It said the railroad had the use of the land "so long as it was used for the railroad right of way." (*Townsend, supra*, 190 U.S. at p. 271.)

> b. The Railroad's lease of the subsurface underlying its rights-of-way in order to generate revenue for itself was not a "railroad purpose"

Implicitly acknowledging that its rights-of-way must be used for railroad purposes, the Railroad argues in its supplemental briefs that the pipelines serve a railroad purpose after all. To support this proposition, it claims that the Railroad uses the fuel transported through the pipeline system to power its locomotives. There is nothing in the record supporting this claim, and no admissible evidence to that effect was ever proffered.[17] But even if true, the mere fact that the Railroad used fuel from the pipelines in its locomotives would not mean the pipeline easements themselves served a railroad purpose. This recent assertion is fully consistent with the Railroad simply purchasing fuel that was transported through the pipeline at an off-site terminal open to the public. Moreover, the question is not whether the contents of the pipeline are ultimately used by the Railroad. The question is whether sinking a pipeline under the Railroad's right-of-way in order to generate revenue for itself serves a railroad purpose.

The case law does not support the Railroad's interpretation. In *Great Northern*, the United States sought to enjoin a railroad from drilling for or removing gas, oil and other minerals from beneath its right-of-way. As in this case, the railroad countered that it was using some of the oil residue on its locomotives and some as fuel for its trains. (*Great Northern, supra*, 315 U.S. at p. 270.) Nevertheless, the Supreme Court concluded that it

---

disavowed anything in *Union Pacific*'s holding that had undermined the "limited fee" concept.

[17]    The Railroad states that "[t]hese facts are not in the record because this issue was never raised below but they are not subject to serious dispute." But as will be seen below, the question of what constituted a railroad purpose was discussed at length during the trial.

should be enjoined. In *Chicago & North Western Ry. Co. v. Continental Oil Co.* (10th Cir. 1958) 253 F.2d 468, a railroad claimed to be entitled to extract oil from beneath its right-of-way, in part because it used the oil itself. The court disagreed that this was a railroad purpose, stating "we do not regard the production of oil on the right of way an appropriate incident to the operation of a railroad, even though the refined product thereof might eventually be used for diesel fuel or other related uses."[18] (*Id.* at p. 473.)

Thus, the mere fact that a railroad leases the subsurface to a third party to transport material that the railroad may ultimately use does not, by itself, make the lease a "railroad purpose." Courts have recognized the distinction between using the end product and renting out the land to transport that product. In *Home on the Range*, a railroad leased out its right-of-way to run fiber-optic telecommunications cable. The court noted that even if running the cable within the right-of-way facilitated the operation of the railroad itself, "the question would remain whether leasing the rights to a third party, as the railroad here did, is within the scope of its granted rights." (*Home on the Range, supra*, 386 F.Supp. at p. 1021.) For something to be a railroad purpose, it must be used to "construct and operate a railroad and to use the land 'for such other purposes as are necessary and incident to railroad construction, maintenance and operation.'" (*Cash v. Southern Pacific R.R. Co.* (1981) 123 Cal.App.3d 974, 977 (*Cash*).) Renting the subsurface to a third party and collecting rent for its use hardly fits that bill. If "railroad purpose" were defined so broadly as to encompass anything that generates revenue for the railroad, it would be "hard to imagine anything the railroads would be unauthorized to do within the right of way." (*Home on the Range, supra*, at p. 1021, fn. 10.)

In *Energy Transp. I*, the district court addressed subsurface rights pursuant to the Pacific Railroad Acts of 1862 and 1864. An adjacent landowner sought to build an underground slurry pipeline under a railroad's right-of-way. The court addressed the "limited fee" cases as well as the *Union Pacific* case. It drew a distinction between a

---

[18]    While both *Great Northern* and *Chicago & North Western Ry. Co.* were cases involving the 1875 Act, we see nothing in the legislative history of either act indicating that the phrase "railroad purpose" should be defined differently in the pre-1871 Acts.

"limited fee" right of the railroad in the land's surface versus the servient estate in the subsurface. (*Energy Transp. I, supra*, 435 F.Supp. at pp. 315-316.) As the court explained, "Congress granted the railroad exclusive use of the surface of the right of way, with broad and extensive rights of sub-lateral and subjacent support to prohibit interference with railroad operations and maintenance; but, from that Hohfeldian bundle of sticks, Congress held back some, like the right of reverter *and the subsoil* and mineral rights except where the lands were 'coal or iron lands.'" (*Id.* at p. 317, italics added; affirmed in *Energy Transp. II, supra*, 606 F.2d 934.)

Thus, the *Energy Transp. I* court held that as to the pre-1871 cases, a railroad did acquire more than a "mere passage over the land." Indeed, it acquired "all rights necessarily incidental to the use of the railroad. Such rights do not preclude reasonable use of the subsurface, for support of trackage or for cuts or tunnels or similar roadbed changes." (*Energy Transp. I, supra*, 435 F.Supp. at p. 318.) But the railroad could not prevent the owner of the servient estate from using the subsurface to build a pipeline in a way that did not "interfere with the [railroad's] valid railroad operations." (*Ibid.*) Once again, the court separated the surface grant of the right-of-way from the servient estate underlying it, opining that "the 'land forming the right of way' did not include the subsoil, servient estate." (*Ibid.*)

We recognize that using the subsurface for the extraction of oil and gas is not the same thing as leasing it to others for the conveyance of oil and gas. But in either case, the Railroad is seeking value from the use of the servient estate, an estate in which its property rights were limited under the Congressional Acts. To paraphrase *Union Pacific*, we would have to forget history and read legislation with a jaundiced eye to hold that when Congress granted only a right-of-way to the railroads, it nonetheless endowed it with the "untold riches underlying the right of way." (*Union Pacific, supra*, 353 U.S. at p. 116.)

The Railroad cites *Mellon v. Southern Pacific Transport Co*. (W.D.Tex. 1990) 750 F.Supp. 226 (*Mellon*) and *International Paper v. MCI Worldcom Network* (W.D.Ark. 2002) 202 F.Supp.2d 895 (*International Paper*) in support of its position. However, neither case does so. In *Mellon*, the railroad's easement was acquired through a grant from the State of Texas and an adjacent landowner owned the servient estate. The railroad nonetheless

31

granted an easement to a telecommunications company to run a cable beneath its right-of-way. Under Texas law, the court found this to be an "incidental use" of the right-of-way with regard to the erection of telegraph and telephone lines. (*Mellon, supra*, at p. 230.) The court also found that the right-of-way surface included the nonmineral topsoil that would be occupied by a buried fiber-optic line, and which would not burden the subsurface in the estate retained by the plaintiff. (*Id.* at p. 231.) That is a far cry from the instant case, in which the Railroad claims to control the servient estate itself and to have the right to bury pipelines deep within it.

*International Paper* was does not support the Railroad either. That case was decided under Arkansas law. Again, it involved running a telecommunications cable in the topsoil of the surface right-of-way, not a pipeline through the servient estate. The railroad had a right-of-way running through land owned in fee by the plaintiff, International Paper. Arkansas state law provided that railroad easements conveyed an interest in the ground that entitles the railroad to lease or license the surplus right-of-way to third parties for railroad purposes. (*International Paper, supra*, 202 F.Supp.2d at p. 901.) Nevertheless, the *International Paper* court noted that "an easement for railway purposes is not a fee." (*Id.* at p. 900.) In determining if the running of defendant's fiber-optic cable served a railroad purpose, the court pointed out that "'[a] railroad purpose is one which is primarily for the benefit of the public, and not a private individual.'" (*Id.* at p. 902.)

As in *Mellon*, the easement in *International Paper* dealt with a fiber-optic cable buried in the topsoil and did not present a significant burden to the servient estate. (*International Paper, supra*, 202 F.Supp.2d at p. 903.) In the instant case, the pipelines burden the subsurface owned by others, allegedly being buried as deep as 40 to 60 feet in some places. Moreover, the Railroad makes no claim that the pipeline "primarily serves a public purpose." Indeed, the Railroad argues this case simply relates to the enforcement of a "private rental agreement," which does not involve any matter of public interest. But that is precisely the point: The rental agreement between the parties is a private arrangement that serves each company's own interest, not the public interest for which the Railroad's rights-of-way were granted.

32

In its supplemental brief, the Railroad attaches memoranda from the Department of the Interior regarding the running of fiber-optic cables through the Railroad's rights-of-way and the application of the pre-1871 and the 1875 Acts, pursuant to title 43 of the United States Code sections 1761 through 1763. But telecommunications cables stand on different footing than pipelines because (1) the original congressional grants were not only for railroad transportation corridors but also telegraph communication corridors; and, (2) the cables generally run through the surface topsoil and do not significantly burden the servient estate. The Railroad does not attach Department of the Interior opinions relating to use of the subsurface in terms of oil or gas leases or pipelines carrying such products.

For example, in 1906, the Department of the Interior was asked to opine on a lease provided by the Missouri, Kansas and Texas Railway Company to an individual operating several oil bearing wells on a portion of the railroad's right-of-way. It appears that part of the right-of-way was granted in 1866 and part was granted in 1902, both by the federal government. In its initial opinion in 1905 (33 L.D. 470), the department opined that the grant under the 1866 act was similar to a grant under the 1864 act and concluded that "upon authority of the case of the Northern Pacific Railway Company *v.* Townsend (190 U.S., 267, 271), . . . the Missouri, Kansas and Texas Railway Company is not authorized to use or permit the use of its right of way for a purpose not contemplated by the granting act, and that although said company took a base fee under its grant of right of way, yet it did not acquire the right to take mineral oils therefrom." (34 L.D. 504-505.) When it came to the portion of the lease relating to the 1902 act, the department was even more emphatic, stating there was no doubt that "a right-of-way acquired under this statute is a mere easement—a title of even less dignity than that given by the granting act of 1866—and therefore with better reason it follows that the company is not authorized to use it except for 'depot grounds, terminals, and other railway purposes.'" (*Ibid*.) The lease for minerals underneath the surface "did not appear to be needed for any railway purpose" and were "clearly not within the privilege granted by the act. . . ." The department went on to state that this was a "manifest invasion of rights belonging to the owner of the fee," advised that the owner was

33

entitled to "the protection of the United States government," and suggested that the matter might be "referred to the Department of Justice." (*Ibid.*)

The Railroad may use the subsurface underlying its pre-1871 rights-of-way for things that support the construction and operation of their railroad—i.e., for railroad purposes. But it cannot use the subsurface for other purposes. Renting out the subsurface to a third party from a different industry for private gain cannot reasonably be considered a railroad purpose.

Therefore, the Railroad's right to collect rent from the Pipeline for use of subsurface easements under the Railroad's "right-of-way property" cannot be based solely on acquisitions obtained via the pre-1871 Acts.

> 3. *Our interpretation of the Congressional Acts is consistent with both public policy considerations and historical context*

Despite the differences between the pre-1871 and the 1875 Acts, their goal was the same—to build and run a transcontinental railroad and telegraph line. They were simply two different means to the same end. To determine the nature and extent of the Railroad's rights under these acts, we must look to what Congress intended at the time of each grant, if such intention can be discerned. (*United States v. Illinois Cent. R. Co.* (E.D.Ill. 1949) 89 F.Supp. 17, 21.) It has long been held that when it comes to the railroad acts, "they are to receive such a construction as will carry out the intent of Congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance." (*Winona, supra*, 113 U.S. at p. 625.) To ascertain intent, "we must look to the condition of the country when the acts were passed, as well as to the purpose declared on their face, and read all parts of them together." (*Ibid.*)

It is helpful to step back from the maze of railroad adjudication and the cross-current of state and federal decisional law it spawned. Taking a broader view of what the country was trying to accomplish with its railroad land grants and easements helps clarify whether the Railroad's conduct here comports with what Congress intended.

In the circumstances of a new country engaged in a great civil war for its very existence, the federal government created a new form of property—railroad rights-of-way.

34

It had many of the indicia of common law property, but was a unique legislative creation that first granted land, and then easements, to the railroads in return for their promise to build a transcontinental railroad.[19]  Each side lived up to its promise.  The great railroads were born, and carried America into the future.  But the law regarding this new form of property gave rise to dispute, conflict, and litigation as both public and private entities tried to pound the new square peg of federally created property interests into the round hole of common law property rights.  Sometimes the peg just did not fit; sometimes more heat than light was generated, leaving splinters and sawdust in its wake.

The Railroad's attempts to analogize from landlord-tenant law to the easements in this case highlight one failure of such an approach.  The Railroad calls the money paid to it by the Pipeline for its perpetual, nonexclusive easement "rent."  But that does not make the Railroad a landlord or the Pipeline a tenant, nor does it make the AREA a lease.  At common law, an easement is an incorporeal, intangible and nonpossessory right to use the land of another, while the owner of the underlying fee retains the rights of possession, subject to the holder's use.  A lease is an agreement that grants to the tenant the rights of exclusive possession and use of real property for a specific period of time and vests exclusive possession of the leasehold in the lessee against all persons, including the owner of the fee.  It creates an *estate* in real property, while an easement merely creates an *interest* in real property that is not an estate.  (6 Miller & Starr, Cal. Real Estate (3d ed. 2006) Easements, § 15.4, pp. 15-17 to15-18.)  Here, the Pipeline's possession of the subsurface is, by the AREA's terms, nonexclusive; and the easements are perpetual, not for a specific period of time.[20]

---

[19]     Congress actually created transcontinental railroads from the early acts.  Indeed, section 1 of the Pacific Railroad Act of 1862 "created and erected into a body corporate and politic in deed and in law, by the name, style, and title of 'The Union Pacific Railroad Company . . .'."

[20]     The Railroad also claimed that a tenant may not challenge a landlord's title, pursuant to Evidence Code section 624.  Like the trial court, we are not persuaded.  Certainly, where there is a mistake of law regarding a landlord's title, it has long been recognized that the rule preventing a tenant from denying his title does not apply.  (*Tewksbury v. Magraff* (1867) 33

The panoply of issues and questions has gone on for a century and a half, and probably will not be fully resolved anytime soon. But a relatively narrow question is presented here: Did the federal acts give the Railroad the right to rent the subsurface under its rights-of-way in order to generate revenue for themselves? Perhaps the answer is best found not in the myriad of cases and opinions interpreting differing laws and unique fact situations, but in what Congress actually did, and why.

From the start, Congress provided the railroads with the right to lay their tracks across the land through the use of land grants and easements. Although reasonable minds may differ on a definition of "railroad purpose," it must, if words mean anything, be something that furthers the purpose of the railroad act itself—which was, expressly, "An Act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean and to secure to the government the use of the same for postal, military, and other purposes." (Pacific Railroad Act of 1862, ch. 120, 12 Stats. 489, capitalization omitted.)

At the time, little could be done with the subsurface other than extract minerals, if present, but Congress did not ignore it completely. The initial Pacific Railroad Act of 1862 expressly exempted "mineral lands." Indeed, the nation was aware of the potential great value and wealth in the subsurface. As noted above, in late 1862, the Secretary of the Interior issued a report extolling the value within the "Western Mineral Lands." (U.S. Dept. of Interior, Abstract from the 1862 Annual Report of the Commissioner of the General Land Office (Nov. 29, 1862).) Clearly, the government considered the land underlying the railroad rights-of-way part of the nation's immense potential wealth. (*Ibid*.)

Not long after, Congress made it even more explicit, passing title 30 of the United States Code section 21, which confirmed that "[i]n all cases lands valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law." In 1922, as the need for railroads began to lessen, Congress enacted a law dealing with the disposition of

---

Cal. 237, 245.) In any event, in light of our analysis of the rights granted by the Congressional Acts, we view the relationship between the Railroad and the Pipeline as being quite different than a typical landlord-tenant arrangement.

abandoned or forfeited railroad grants (43 U.S.C. § 912), which addressed how the railroads could convey their rights-of-way. That section expressly reserved all oil, gas, and other minerals in the land to the United States. As stated in *Great Northern* when referring to the 1875 Act, "[t]he Act was designed to permit the construction of railroads through the public lands and thus enhance their value and hasten their settlement. The achievement of that purpose does not compel a construction of the rights of way grant as conveying a fee title to the land and the underlying minerals; *a railroad may be operated though its right of way be but an easement.*" (*Great Northern, supra*, 315 U.S. at p. 272, italics added.)

Once pipelines did become a factor, Congress acted on them as well. In 1920, it enacted title 30 of the United States Code section 185, which addresses rights-of-way for pipelines through federal lands. The Department of the Interior was authorized to provide leases for such pipelines in return for annual payments of fair market value. (30 U.S.C. § 185(*l*).) In 1930, Congress specifically addressed the land under railroad rights-of-way in terms of authorization for leases of oil and gas deposits. It expressly applied the new law to leases "in or under lands embraced in railroad or other rights of way acquired under any law of the United States, *whether the same be a base fee or mere easement*" (30 U.S.C. § 301, italics added), and provided for royalties to be paid to the United States. (30 U.S.C. § 305.) Thus, when it came to leases in the subsurface, Congress expressly eliminated any distinction between the pre-1871 and 1875 acts. This hardly reflects an intent on the part of Congress that the Railroad could use the subsurface under its rights-of-way as it pleased. Quite the contrary.

Of course, times change, circumstances change, and "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." (*United States v. Price* (1960) 361 U.S. 304, 313.) Because legislative goals change over the years, "[r]esort[ing] to using subsequent congressional activity of any variety to interpret earlier legislation should be cautiously approached . . . ." (*Beres, supra*, 64 Fed.Cl. 403, 416.) Yet one cannot help but note that subsequent acts of Congress are protective of the value to be found in the subsurface, which is fully consistent with the express reservations in the pre-1871 Acts relating to mineral lands, and the case law interpreting the 1875 Acts granting

37

rights-of-way as mere easements, leaving ownership of the subsurface with the government. Combining this with the conventional rules that "any ambiguity in a grant is to be resolved favorably to a sovereign grantor" (*Great Northern, supra*, 315 U.S. at p. 272) and that "'nothing passes but what is conveyed in clear and explicit language'" (*ibid*., quoting *Caldwell v. United States* (1919) 250 U.S. 14, 20), one would have to engage in a terrible distortion of law and logic to find that somehow the railroad, not the government or its grantees, obtained the rights to the subsurface underneath its rights-of-way to do with it as it saw fit—especially when a railroad purpose must be something that furthers the goal of the legislative enactment, not something that merely serves the economic interests of a private company.

And yet, that is essentially the position taken by the Railroad here. It argues that it has what is tantamount to a fee interest in the subsurface underlying its rights-of-way (both via pre-1871 and 1875 Acts), and that it may rent it out for its own private gain. It has submitted no evidence, indeed it makes no claim, that its collecting rent from the Pipeline in some way helps the Railroad itself run, as opposed to merely providing revenue to the company for the benefit of its shareholders.[21] Yet it must be recalled that the rights-of-way

---

[21]    We have pointed out that raising revenue for its shareholders does not fit the definition of a railroad purpose under the Congressional Acts. However, the Railroad's in-house expert on title issues had another view at trial, where he testified as follows:

"[COUNSEL FOR THE RAILROAD:] One of the phrases that we heard very often over the last few days was references in title grants of various types utilizing the phrase 'for railroad purposes.' [¶] I don't think Mr. Kerr ever asked you what that phrase means to your understanding. Could you please explain that to us? [¶] . . . [¶]

"[THE WITNESS:] To me, 'railroad purposes' means whatever the railroad determines beneficial for its operations. [¶] . . . [¶]

"[COUNSEL FOR THE RAILROAD:] Mr. Oakman, when you used the term that I think Mr. Kerr helped you to use as your definition of 'railroad purposes,' is it accurate that the definition you've just used is your understanding of 'railroad purposes' based on your years of experience working with the two railroads?

"[THE WITNESS:] I think that's true. [¶] And if I can further explain, I think, you know, when I go look for a definition of anything, whether a company or not, I would look for the purpose of that company, what that company is all about, what their mission

were given initially so the railroads could perform their "obligations to the United States." (*Townsend, supra*, 190 U.S. at p. 673.) Whatever one considers to be the nature of the Railroad's legal interest in this land, it was not sold to the railroads by Congress. It was granted in return for the railroad's promise—well fulfilled, indeed—to construct and operate a transcontinental railroad.

It is difficult to imagine that in a time of national crisis a rational Congress would pass, and the President would sign, laws to encourage the railroads to construct a transportation corridor through public lands and across the nation, seen as critical to the safety and development of the country, and at the same time mean to give the railroads the right to rent the subsurface under that corridor to private third parties from a nonrailroad industry, in order to generate revenue for itself. Even more difficult to fathom would be an intent to have the railroad continue to collect such revenue even after it abandons, sells, transfers, conveys, or otherwise ceases using the surface rights-of-way at all—for a railroad or otherwise.[22]

Indeed, as previously noted, the original grants expressly describe their purpose. For example, the original Pacific Railroad Act of 1862 was passed "to lay out, locate, construct, furnish, maintain, and enjoy a continuous railroad and telegraph, with the appurtenances" and to "aid[] in the construction of [the] railroad and telegraph line." (Ch. 120, §§ 1, 3, 12 Stats. 489.) The Act of July 2, 1864, was meant for the "construction and working of said road." (Ch. 216, § 3, 13 Stats. 356.) And the Act of July 25, 1866, required the railroad companies "to operate and use the portions or parts of said railroad and telegraph . . . for all purposes of transportation, travel, and communication, so far as the government and public

---

statement is. [¶] And to me, the railroad keeps telling us that their mission statement is to further enhance the value of the shareholders. [¶] To me, that's the purpose of the railroad, to further enhance the value of the shareholders.

"[THE COURT:] So are you saying that anything that the railroad determines will further enhance the value to the shareholders is railroad purposes?

"THE WITNESS: I think within the law, yes, it would be."

**22** See, part III.C., *post*, re pre-1994 sale of properties.

are concerned . . . ." (Ch. 242, § 7, 14 Stats. 239.) There is nothing in the statutory language, nor its content or context that remotely suggests that Congress meant to give the railroads the right to use the land under their rights-of-way to generate revenue for themselves.

At oral argument, counsel for the Railroad claimed that the pipeline served a railroad purpose because the Pipeline and the Railroad were sister companies at the time the easements were first granted, citing *Faus v. City of Los Angeles* (1967) 67 Cal.2d 350 (*Faus*). The Railroad likewise cites *Faus* in its supplemental letter brief. But *Faus* fails to support the Railroad's position. In *Faus*, grants to a railroad (which did not come from the federal government) provided that the right-of-way was to be used for an electric railway. When times changed and gas powered vehicles became more prevalent, electric rails diminished in use. The California Supreme Court held that changing the use from electric rails to motor coach service complied with the original purpose of the grantors, which was to provide a means of public transport for adjacent landowners. Switching bus service for a street car network constituted an "adequate substitute." (*Id.* at p. 355.) Stating that "'a dedication must be understood and construed with reference to its primary object and purpose,'" our Supreme Court pointed out that the underlying and main purpose of the grant—improvement of public transportation by a public utility for the benefit of the public—was still being achieved. (*Id.* at p. 356.) *Faus* is inapposite to the instant case, where the pipeline had nothing to do with construction of the railroad, and provides no transportation, travel, or communication, so far as the government and public are concerned.

The Railroad tries to analogize by saying that conveying commodities through a pipeline is simply a "change in modality of transportation—here, from trains to pipeline— [which] does not change the railroad purpose" (citing *Faus, supra*, 67 Cal.2d at pp. 358-359 & fn. 6.) But the analogy fails because leasing the subsurface below the railroad's tracks in order to convey oil and gas is a far cry from simply substituting electric trolleys for buses on the land's surface to accomplish the same overall goal—transportation of passengers.

The Railroad cites *City of Long Beach v. Pacific Elec. Ry. Co.* (1955) 44 Cal.2d 599 for the proposition that the phrase "railroad purpose" must be used broadly, to include

40

things like lumberyards built in the right-of-way. But *City of Long Beach* was a condemnation action where the railroad had used part of the surface of its right-of-way for a lumberyard and related purposes. The question was whether the city's efforts to condemn an easement across the right-of-way for street purposes warranted more than nominal compensation to the railroad. The issue of whether the railroad could lease its surface right-of-way for commercial purposes if it contributes to the railroad's business was discussed in dicta, but was not part of, or necessary to, the holding. Importantly, the case had nothing to do with subsurface rights, or whether the railroad could lease the servient estate to third parties and collect rent on it. Clearly, the railroad's interest in the surface right-of-way stands on different footing than its interest, if any, in the subsurface. Moreover, *City of Long Beach* was decided in 1955, before the seminal *Union Pacific* case addressed the retained rights of the federal government to the subsurface beneath the rights-of-way. Therefore, it is not helpful to the present analysis.

Like *City of Long Beach*, the other cases cited by the Railroad for the proposition that the proper use of its right-of-way (whether by land grant or easement) should be broadly construed deal with uses on the *surface* of the land within the right-of-way. There is little doubt that as to the surface, the Railroad's rights are substantial. That makes sense. Its trains run on the surface. Its stations and terminals are above ground. No one else has a right to use the surface, or interfere with the Railroad's use of it, as long as trains run on it. The Railroad needs to control the surface in order to operate.

The same cannot be said of the subsurface. The Railroad does not need a corridor under the surface that conveys gas and oil in order to operate its trains. It can operate just as well without it and did for many years before it granted easements to the Pipeline and, presumably, still does in areas where there are no subsurface pipelines. Having a pipeline underneath the surface is not "'necessary and incident to railroad construction, maintenance and operation.'" (*Cash, supra*, 123 Cal.App.3d 974, 977.) As the United States Supreme Court noted over 70 years ago, "a railroad may be operated though its right-of-way be but an easement." (*Great Northern, supra*, 315 U.S. at p. 272, italics added.) Indeed, that is

41

precisely why the Railroad can lease the subsurface to third parties like the Pipeline—it does not need it to run its trains.

Finally, the Railroad argues that it can do anything with its rights-of-way that is "not inconsistent with" railroad purposes. But that is not the law. It is not enough that the activity is "not inconsistent with" railroad purposes; the activity must actually *serve* a railroad purpose. The right-of-way was granted to the Railroad "for the construction of [the] railroad and telegraph line.' [Citation.] *That purpose is not fulfilled* when the right of way is used for *other purposes*.'" (*Home on the Range, supra*, 386 F.Supp.2d at p. 1022, citing *Union Pacific, supra*, 353 U.S. 112, 114, italics added by *Union Pacific*.) As the *Home on the Range* court explained, the United States Supreme Court in *Union Pacific* did not say or imply that the basis for its holding was that the activity in question was inconsistent with railroad purposes. Rather, it was "simply . . . not a railroad purpose." (*Home on the Range, supra*, at pp. 1022-1023.) The court then cited a Department of the Interior decision to that effect, stating that "'any use of a railroad right of way, or any portion thereof, for *other than* railroad purposes is prohibited. A right of way granted by Congress through the public domain may be used *only* and *exclusively* for railroad purposes.'" (*Id.* at p. 1023, citing *Use of Railroad Right of Way for Extracting Oil* (Sept. 8, 1937) 56 I.D. 206, 211, italics added by *Home on the Range*.)

The novel (and successful) plan put into place via statute to build a transcontinental railroad may have created a confusing crazy-quilt of laws and customs when attempts are made to superimpose on it traditional concepts of common law. But in the end, there is nothing in the language of the statutes, much less the relevant history, purpose, law or precedent, suggesting that Congress intended to give the Railroad the right to use the land under its rights-of-way for nonrailroad purposes, like renting it out to third parties. Congress did not include such a provision, and we will not insert, create, recognize or enforce such a provision here.

If the Railroad has the right to collect rent pursuant to the AREA for the period of time between 2004 and 2014, it did not obtain that right from the Congressional Acts of the 1800's—not from the 1875 Act, which granted the Railroad too few "sticks" to allow it to

42

grant property interests in the servient estate, which was owned by others; and not from the pre-1871 Acts, because even though it was given more "sticks," the pipeline itself does not serve a railroad purpose. The pipeline simply does not further the legislative intent of the acts. Thus, to the extent the Railroad has the right to collect rent from the Pipeline, it must have acquired that right from sources other than the Congressional Acts.

C. **The Rights of the Railroad to Collect Rent Pursuant to the AREA and Related Agreements Irrespective of Congressional Authorization**

The mere fact that the Congressional Acts did not give the Railroad sufficient interest in the land to grant subsurface easements to the Pipeline and collect rent therefrom does not end the inquiry. As discussed in more detail below (part III.B.1., *post*), the Railroad may well have acquired additional rights through other means. By 2004, it may have had rights to the subsurface under some of its rights-of-way that surpassed the rights originally granted by Congress. Indeed, it appears that evidence was presented during trial suggesting that, separate and apart from the Congressional Acts, the Railroad claimed title to approximately 50 percent of the land. Since the trial court erroneously concluded that the Railroad had title to "virtually all of the subject property," there was no finding by the court as to how much of the land was actually the "property of the railroad."

Therefore, the case must be remanded to the trial court for further proceedings to determine which pipeline easements ran through the "property of the railroad" between January 1, 2004, and December 31, 2013. Rent may be charged by the Railroad only on those easements. Rent may not be charged on easements that ran through rights-of-way acquired by the Railroad solely via the Congressional Acts.

II. **Valuation Issues Resolved as Part of the 1994 Case Do Not Collaterally Estop the Parties from Litigating Them in the Instant Case**

In the next two parts of our opinion, we turn away from the property rights of the Railroad and discuss the valuation methods employed by the trial court. In this part, we address the Pipeline's claim that the trial court erred in adjudicating certain valuation issues because those issues were resolved in earlier litigation between the parties. In part III, we discuss contentions relating to the specific valuation methods adopted by the trial court.

43

There, we see how the determination of what constitutes the "property of the railroad" bears upon the calculation of the amount of rent due.

### A. Principles of Issue Preclusion

The Pipeline contends that the judgment in the 1994 case collaterally estops the Railroad from litigating some of the issues in this 2004 case. The doctrine of collateral estoppel is one aspect of the concept of res judicata. "In modern usage, however, the two terms have distinct meanings. The Restatement Second of Judgments, for example, describes collateral estoppel as 'issue preclusion' and res judicata as 'claim preclusion.'" (*Lucido v. Superior Court* (1990) 51 Cal.3d 355, 341, fn. 3 (*Lucido*).) The purpose of issue preclusion is "to prevent a party from repeatedly litigating an issue in order to secure a different result" when it had a full and fair opportunity to do so previously. (*Direct Shopping Network, LLC v. James* (2012) 206 Cal.App.4th 1551, 1562-1563 (*Direct Shopping Network*).) Collateral estoppel "'has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation.'" (*Smith v. ExxonMobil Oil Corp.* (2007) 153 Cal.App.4th 1407, 1414.) In order for collateral estoppel to apply, the issue one seeks to preclude from relitigation (1) must be identical to that decided in the former proceeding, (2) must have been actually litigated in the former proceeding, (3) must have been necessarily decided in the former proceeding, (4) the decision must have been final and on the merits, and (5) the party against whom preclusion is sought must be the same as, or in privity with, the party in the former proceeding. (*Lucido, supra*, at p. 341.) Since it constitutes a question of law, the trial court's application of collateral estoppel is reviewed de novo. (*Smith,* at p. 1415.)

Numbers (2) through (5), above, are clearly present in this case. The question turns on whether the issues that were determined in the first proceeding were "identical" to any of the issues that were to be determined in this proceeding. The Pipeline claims that certain factors relating to the value of easements in transportation corridors were fully litigated and finally determined in the 1994 case, and that the trial court was precluded from adjudicating them a second time. The Railroad claims that these factors change over time, and therefore

44

the facts and circumstances in 2004 are not identical to those in 1994. Therefore, according to the Railroad, issue preclusion does not apply.

Collateral estoppel does not bar a later claim if new facts or changed circumstances have occurred since the prior decision. (*Melendres v. City of Los Angeles* (1974) 40 Cal.App.3d 718, 730.) Neither res judicata nor collateral estoppel were ever "'intended to operate so as to prevent a re-examination of the same question between the same parties where, in the interval between the first and second actions, the facts have materially changed or new facts have occurred which have altered the legal rights or relations of the litigants.'" (*Evans v. Celotex Corp.* (1987) 194 Cal.App.3d 741, 748 (*Evans*).) "Collateral estoppel does not apply where there are changed conditions or new facts which did not exist at the time of the prior judgment . . . ." (*United States Golf Assn. v. Arroyo Software Corp.* (1999) 69 Cal.App.4th 607, 616.) Thus, the question here is whether any determinations that needed to be made in the instant case were identical to those decided in the 1994 case.

### B. The Trial Court's Ruling re Issue Preclusion

The trial court utilized the "Across-the-Fence" (ATF) method to value easements through transportation corridors. The ATF method utilizes four factors to arrive at the rent: (1) the total value of the land occupied by the easement and through which it travels; (2) an "enhancement factor" reflecting the special value of a transportation corridor in that location; (3) a "use factor" representing the extent or percentage of the fee constituting the nonexclusive subterranean easement; and (4) the appropriate rental rate, or "rate of return."[23] These factors will be discussed in more detail below.[24] But for present purposes, we note that the parties were in close agreement on the total value of the land occupied by the easement. And they agreed that collateral estoppel could not bar a new determination of the rate of return. Therefore, the arguments as to issue preclusion relate to the remaining factors, enhancement and percentage of use.

---

[23] The easement rent derived from the ATF formula is shown in the following equation: (total land value) x (enhancement factor) x (use factor) x (rate of return) = rent.

[24] The ATF method was explained in both *Santa Fe I* and *Santa Fe II*.

On at least three separate occasions—before, during, and after trial—the Pipeline asked the trial court to find that collateral estoppel should be applied to the use and enhancement factors, and therefore the Railroad should be bound by those determinations made by the temporary judge in 1994.[25] The Pipeline argued that as to these factors, the facts and circumstances in 2004 were identical to those in 1994. The Railroad argued that the use and enhancement factors were not subject to collateral estoppel because they were based upon expert opinion, not "immutable physical facts." The temporary judge in the instant case appeared to give significant weight to this argument. He looked to whether the prior findings in the 1994 case were a "fixed fact, such as the width of the specific easement in a specific location, or findings of a market-based fact valid at a particular time, but subject to change over time." When applied to the enhancement factor, the trial court stated that the "essential questions are (1) whether the factor determined by the court is fixed and permanent or subject to change, and (2) if it is subject to change, what enhancement factor is shown by the evidence in this case." The trial court stated that "appraisal opinions . . . are not fixed facts, but are market driven" and concluded that an expert determination was not a physical artifact. That is, it was an "economic determination, not a physical determination." Therefore, they were inherently "subject to change." This analysis raises two separate issues.

First, a fixed or immutable physical determination is not a prerequisite for the application of collateral estoppel. While it is true that fixed, immutable physical facts, by definition, cannot change and therefore will be "identical" over time, it does not follow that findings must be based on fixed, immutable physical facts in order to be accorded collateral estoppel effect. Indeed, they may well be based upon expert opinion. For example, in a tort

---

[25]     The Pipeline's desire to lock in the 1994 findings regarding the enhancement and use factors is understandable. In 1994, the temporary judge found an enhancement factor of 1 (i.e., no multiplier) and a use factor of 40 percent. (*Santa Fe II, supra*, A103990.) However, the temporary judge in 2004 found an enhancement factor of 1.25 and a use factor generally of 60 percent (with the exception of a few properties, where a 70 percent use factor was utilized). Since the rent is the product of four factors, any change in one of them is multiplied and magnified proportionally.

46

case where an expert testifies that the defendant was professionally negligent and the jury so finds, that finding may well have issue preclusion effect in subsequent litigation. The professional negligence is not an "immutable physical fact." But where the issue was litigated, decided, final, and on the merits, collateral estoppel applies as between the same parties (or those in privity with them).[26] After all, issue preclusion applied in both *Evans* and *Direct Shopping Network,* above, even though the findings in *Evans* were based upon expert opinions regarding negligence and the ruling in *Direct Shopping Network* turned on the likelihood of prevailing at trial in an anti-SLAPP case—hardly fixed, permanent (much less physical) factors. To the extent the trial court concluded that it could apply collateral estoppel only to fixed, immutable physical facts or artifacts, it employed a faulty analysis.

Second, the phrase "subject to change over time" as used by the trial court is ambiguous. It is clear that if facts and circumstances change after the first case is final, they are no longer "identical" by the time the second case rolls along. "[T]he estoppel effect of a judgment extends only to the facts in issue as they existed at the time the prior judgment was rendered." (*People v. Carmony* (2002) 99 Cal.App.4th 317, 322.) "Some issues are not static, that is, they are not fixed and permanent in their nature. When a fact, condition, status, right, or title is not fixed and permanent in nature, then an adjudication is conclusive as to the issue at the time of its rendition, but is not conclusive as to that issue at some later time." (*Ibid.*, citing *Lunt v. Boris* (1948) 87 Cal.App.2d 694, 695.)

In *Hurd v. Albert* (1931) 214 Cal. 15, the plaintiff brought an action on a restrictive residential covenant. Defendant argued that the nature of the property had changed over time so that the restricted covenant no longer applied, despite a finding in a prior action five years earlier that the covenant did apply. Defendant argued that in those five years, the nature of the territory changed, warranting a release from collateral estoppel effect. Our Supreme Court held that res judicata was never intended to prevent a reexamination of the

---

[26]    Of course, if the facts or circumstances upon which the expert based his or her opinion changed between the two proceedings, this could raise a question of whether issue preclusion was applicable.

47

same question between the same parties where, over time, the facts have materially changed. (*Id.* at p. 26.) In the second trial, the court "may and should consider all the facts that exist, both prior and subsequent to the first action, so as to determine properly what effect all of the facts, as they exist at the time of the second trial, have on the rights of the parties." (*Ibid.*)

It is unclear whether, in using the phrase "subject to change over time," the trial court here simply meant that the facts underlying the enhancement and use factors *might* have changed. If so, this would be an erroneous test. After all, virtually anything *could* possibly change over time. The question for issue preclusion purposes is whether the facts *did* change over time. However, if the trial court meant that the facts underlying the enhancement and use factors, by their nature, inherently change over time, then the conclusion that they had changed between 1994 and 2004 would be a reasonable, if not an inevitable, one. If things are known to change over time, and a significant amount of time passes, the inference that those things are no longer "identical" to the way they were is compelling. Change is implicit in the facts and implied in the conclusion.[27] In any event, we need not determine if the trial court's reasoning was correct. We review the correctness of the judgment, not the reasoning or grounds assigned for the ruling, and will affirm a judgment correct on any theory. (*Estate of Kampen, supra*, 201 Cal.App.4th 971, 1000.) The evidence at trial demonstrated changes in facts and circumstances between 1994 and 2004 that affected the rental value of the easements, including the enhancement and use factors, that would have made issue preclusion improper.

### C. Issues Potentially Subject to Preclusion

#### 1. Enhancement Factor

The enhancement factor (sometimes referred to as the corridor factor) in the ATF valuation method relates to whether there is a special value of a connecting corridor, above

---

[27] When it comes to real estate values, a court may even take judicial notice that they do not remain constant. (*Silva v. City & County of San Francisco* (1948) 87 Cal.App.2d 784, 788.)

and beyond its highest and best use. Enhancement factors represent a premium, if any, that a buyer or renter would pay, over the property value, for the benefit of enjoying an already continuous corridor owned by a single entity. For example, such a premium might be very small or nonexistent in areas of open desert in New Mexico, and might be substantial in a heavily developed urban area in California. As the trial court pointed out, such a factor is a product of market forces and other considerations, rather than a fixed, immutable number. Over time, the nature and/or development of these various properties are subject to change, thereby changing the premium that a renter would pay.

The record reveals changes as to these issues between the 1994 case and the instant 2004 case. Evidence was presented of more recent transactions, including transactions entered into by the Railroad and by the Pipeline. Transactions that were part of the record in the 1994 case might or might not be entitled to the same weight accorded to them earlier. The evidence in the instant case included new information about land values and enhancement factors that did not exist in the earlier case. In addition, the trial court was presented with evidence that the Pipeline had recently acquired property for new construction for a Concord-to-Sacramento pipeline. In doing so, it had utilized the ATF process, and inferences could be drawn from these new facts that did not exist in the 1994 case.

In addition, there was testimony at trial from which one could reasonably infer there were changes in the facts and circumstances as they related to enhancement (or corridor) factors. As one example, an expert for the Railroad was asked about any changes in enhancement factors in the years leading up to 2004. He testified as follows:

"Q  Had your ATF or corridor segment value as we use our formula changed?

"A  Yes, sir. The ATF value changed dramatically, because the price of real estate in that area increased rather significantly over that time period, as one would expect.

"Q  Did your enhancement factor or corridor factor change over that period of time?

"A  Yes. And the reason being is my analysis of corridor sales is rather dynamic. I'm always getting additional corridor sales. And additional

49

[information.] [A]nd so each time I do a valuation I go back and I analyze those sales again. And so the corridor factor has changed over that period of time, even though the value, the importance of that corridor as a corridor, has not really changed."

Thus, there was substantial evidence of a change in facts and circumstances between the 1994 case and the 2004 case as regards the parameters that make up the enhancement factor. The trial court's ruling relating to collateral estoppel was correct. There was no error in denying the Pipeline's request for issue preclusion regarding the enhancement factor.

### 2. *Use Factor*

The use factor is that portion of the fee value attributed to the easement. As noted, the trial court considered whether the use factor was purely physical (i.e., "physical artifact") or a market-based economic element. It pointed out that the appellate court in *Santa Fe II* considered it something that required expert appraisal opinion. (*Santa Fe II, supra*, A103990.) But more than that, it concluded that an expert opinion based upon market behavior is "inherently subject to change," and 10 years had passed between the 1994 and 2004 valuations.

Moreover, the Railroad's expert testified that the use factor is "market extracted from actual sales and agreements" and was in the range of 75 percent for subsurface occupancies such as the easements here. For determining both enhancement and use factors, another expert for the Railroad testified, and brought documentation of, scores of transactions, many of which were after 2000 and some as late as 2003. He testified about numerous transactions between 2000 and 2003 with use rates in the range of 50 percent to 90 percent. And he compared pre-2000 transactions to post-2000 transactions, placing more weight on the recent transactions. He also opined as follows:

"Q And do you conclude that use rates for the later transactions of the period 2000 to 2003 are somewhat higher than use rates in earlier transactions for [the Railroad]?

"A Yes.

"Q What were the use rates you were seeing in the earlier [Railroad] transactions?

"A  In the 50 percent range.

"Q  Is this an example of use rates changing over time?

"A  Yes.

"Q  Is this one reason why a determination of use rate in 1994 isn't determinative of use rates in 2004?

"A  Yes."

Based on the record, it can hardly be said that the facts from which the use factor was determined had not changed since 1994.  These facts were not fixed or permanent in their nature.  Rather, there was substantial evidence that the facts had changed between 1994 and 2004.  As with the enhancement factor, the trial court's ruling regarding collateral estoppel relating to the use factor was correct.  Precluding either party from relitigating the use factor would have been an error of law.  Allowing the parties to relitigate the issue in order to update it was not.

### D.      There Is No Equitable Basis for the Application of Issue Preclusion Here

Besides the classic five criteria for applicability, "[t]here is an equitable component to collateral estoppel" as well.  (*Direct Shopping Network, supra*, 206 Cal.App.4th at p. 1562.)  "'[E]ven where the technical requirements are all met, the doctrine is to be applied "only where such application comports with fairness and sound public policy."'"  (*Ibid*., citing *Smith v. ExxonMobil Oil Corp., supra*, 153 Cal.App.4th at p. 1414.)

Courts must look at the entire record to equitably apply issue preclusion, allowing a party to avoid having to revisit and relitigate an issue already fairly resolved.  But in this case, there is an extra wrinkle:  As part of the settlement of their 1991 litigation, the parties agreed that the Railroad could seek a rent increase in accordance with the fair market value of the easement every 10 years.[28]  In anticipation of litigation in the event they were unable to agree on an increase, the AREA set out a specific procedure for judicial intervention on a regular basis.  The history of this case is consistent with those expectations.

---

[28]      The idea of recalculating the rent at regular intervals began at the very beginning, with the master agreements of 1955 and 1956.

If the parties had thought the rent was something static and fixed, there would have been no need to build in a preplanned rent increase, nor to provide a mechanism to resolve their disputes every 10 years under judicial auspices. One can fairly assume that both the Railroad and the Pipeline believed the market value of the easement would change over that length of time. But perhaps more important, they appear to have contemplated that determining that market value would require a more complex and sophisticated analysis than simply looking to inflation or general property values. Otherwise, the consumer price index (CPI) or some similarly objective economic indicator of overall property values would probably have been sufficient. Instead, they scheduled increases in rent, anticipated disagreement, and planned for judicial intervention to determine the rent increase. This process has by now been utilized for the first and second decades of the AREA. Seen in that light, this case anticipates new ground being plowed every 10 years.

In the context of this case, collateral estoppel takes on a different sheen. While the doctrine is designed to "prevent a party from repeatedly litigating an issue in order to secure a different result" (*Direct Shopping Network, supra*, 206 Cal.App.4th at p. 1562), it also seeks to "prevent inconsistent results and promote finality and judicial economy by bringing an end to litigation" (*Flynn v. Gorton* (1989) 207 Cal.App.3d 1550, 1554). But in the unique circumstances of this case, "inconsistent results" (in the sense of different rent amounts) every 10 years was assumed by the parties. Repeated litigation was clearly foreseeable, if not probable. Otherwise, the parties would not have stipulated to return to court at regular intervals, at great expense to both sides. This procedure itself, including the plans for regularly scheduled referees and judicial intervention, was anything but conducive to achieving "finality and judicial economy." In short, the parties knew from the start that relitigation was in the offing.

The court must "'consider whether the traditional requirements and policy reasons for applying collateral estoppel [are] satisfied by the facts of [the] case.'" (*Lucido, supra*, 51 Cal.3d at p. 343, quoting *People v. Sims* (1982) 32 Cal.3d 468, 477.) Issue preclusion is "'not an inflexible, universally applicable principle; policy considerations may limit its use where the limitation on relitigation underpinnings of the doctrine are outweighed by other

52

factors'" (*Ibid.*) Where there is doubt about the application of issue preclusion, it should not apply. (*Flynn v. Gorton, supra*, 207 Cal.App.3d at p. 1554.) "Accordingly, the public policies underlying collateral estoppel . . . strongly influence whether its application in a particular circumstance would be fair to the parties and constitute sound judicial policy." (*Lucido, supra*, at p. 343.)

In this case, the "limitation on relitigation" policy that collateral estoppel seeks to promote is undermined by the AREA itself, a preexisting agreement between the parties to recalculate the rent every 10 years and seek judicial intervention when they fail to reach an accord. Under the circumstances, the application of collateral estoppel would be unlikely to prevent inconsistent results or promote finality and judicial economy. Thus, application of issue preclusion would not further the goals that the doctrine was designed to promote.

We affirm the trial court's rulings that denied the Pipeline's motions for issue preclusion.

### III. <u>Valuation of the Easements—The Rent Due Under the AREA</u>

#### A. ATF vs. Comparable Value Appraisals

The Pipeline argues that the trial court erred in not utilizing their "comparable value method" as evidence of the amount of rent due. The Pipeline contends the trial court did not consider its properly admitted evidence, because failing to give weight to evidence is "tantamount to exclusion." And the Pipeline asserts that this is "the flip side of [*Santa Fe I*], where the trial court 'considered' but did not formally 'admit' the ATF appraisal evidence . . . ." Here, according to the Pipeline, the trial court "admitted" but did not "consider" the comparable transaction evidence. These arguments are without merit.

In *Santa Fe I*, the Court of Appeal reversed because the trial court excluded the Railroad's ATF evidence entirely, preventing it from proving its case and denying it a fair trial. Having excluded the ATF evidence, the trial court never considered its probative value. Here, to the contrary, the trial court admitted the Pipeline's evidence, but after due consideration concluded it had no persuasive effect. The Pipeline fails to recognize or accept the fundamental distinction between the admissibility of evidence and its weight.

53

The Pipeline cites the case of *County of San Luis Obispo v. Bailey* (1971) 4 Cal.3d 518 (*San Luis Obispo*) for the proposition that a judge's decision regarding comparability under Evidence Code section 816 is to be guided by whether a proffered sale "'may fairly be considered as shedding light on the value of the property . . . .'" (*San Luis Obispo,* at pp. 524-525.) It apparently argues that if evidence is admitted because it sheds light on the value of property, it must shed *some* light—that is, it must have *some* probative value. Thus, it should not be discounted altogether. But like a preliminary fact offered in support of proffered evidence, it is up to the trier of fact to ultimately determine the evidence's weight once it is admitted. (Evid. Code, §§ 401-403.) Just because, as a preliminary matter, a court finds sufficient grounds to admit evidence does not mean it will ultimately have probative value or persuasive effect.

Indeed, *San Luis Obispo* itself explains that once evidence is admitted on the grounds of comparability, "'the degree of comparability is a question of fact for the jury.'" (*San Luis Obispo, supra*, 4 Cal.3d at p. 525.) After all, when it comes to determining the weight to be given to evidence regarding the valuation of property, "[t]he trier of fact is the sole arbiter of such matters [citations]; is not required to accept the opinion testimony of any witness as to value [citation]; [and] in the exercise of judicial discretion may accept that part of such testimony he concludes worthy of belief and reject that part which is unworthy of belief . . . ." (*South Bay Irr. Dist. v. California-American Water Co.* (1976) 61 Cal.App.3d 944, 965.)

Other cases cited by the Pipeline also fail to support its position. For example, in *Lewis Food Co. v. Fireman's Fund Ins. Co.* (1962) 207 Cal.App.2d 515, the appellate court reversed a trial court that admitted evidence but did not consider it, but that was because the trial court erroneously believed the evidence could not be considered. (*Id.* at p. 524.) Here, in contrast, the Railroad moved to exclude the Pipeline's evidence and its motion was denied (with minor exceptions). Taking heed of the reversal of the trial court in *Santa Fe I*, the temporary judge not only admitted the testimony and opinions of the Pipeline's experts but considered and analyzed them extensively. In his statement of decision he explains in detail why he concluded the evidence did not assist him in reaching a conclusion. But there

54

can be no doubt that the court both admitted and considered the Pipeline's valuation evidence before concluding it was not persuasive.

The Pipeline's reliance on *Vanieken-Ryals v. Office of Personnel Management* (Fed.Cir. 2007) 508 F.3d 1034 (*Vanieken-Ryals*) is also misplaced. There, the trial court erroneously refused to consider evidence that it was required to consider by law, resulting in error. (*Id.* at p. 1041.) That is a far cry from what occurred here, where the trial court carefully reviewed the Pipeline's evidence and found it lacking. In *Gui Cun Liu v. Ashcroft* (3d Cir. 2004) 372 F.3d 529, another case cited by the Pipeline, the trial judge admitted a document in a pro forma manner, but because it was not certified he stated at the outset it would be given "'no weight.'" The appellate court held this was tantamount to not admitting it at all. (*Id.* at pp. 531-532.) That did not happen here. The trial court not only admitted massive amounts of the Pipeline's evidence but considered it at length. Indeed, it dedicated over 30 pages of its statement of decision to an analysis of, and comparison between, the Pipeline's comparative appraisal approach and the Railroad's ATF approach. Ultimately, it concluded that the Pipeline's evidence lacked persuasive force, which was its prerogative as the trier of fact.

We review the admissibility and weighing of evidence by an abuse of discretion standard. As pointed out by one of the cases cited by the Pipeline, "[g]iving little weight to specific evidence because of its individual failings . . . is a factual analysis over which we have no jurisdiction to review." (*Vanieken-Ryals, supra*, 508 F.3d at p. 1040.) There was no error by the trial court in its considering and weighing of the evidence regarding appraisal methods.

### B. The Trial Court's Valuation Utilizing the ATF Method

The trial court utilized the ATF method in determining the amount of rent due under the AREA. This method is generally used in valuing transportation corridors. Indeed, in *Santa Fe I* both sides initially presented expert testimony using the ATF method. The trial court refused to admit or consider such evidence and the Court of Appeal for the First Appellate District found that the Railroad was denied a fair trial. The first judgment was reversed on those grounds. (*Santa Fe I, supra*, 74 Cal.App.4th at p. 1248.)

55

As noted above, the ATF method incorporates four elements: (1) the total value of the land occupied by the easement and through which it travels; (2) the enhancement (or corridor) factor, if any, reflecting the special value of a connecting corridor; (3) the percentage of the fee constituting the nonexclusive subterranean pipeline easement (i.e., the actual underground and access rights conveyed); and, (4) an appropriate rental rate or "rate of return." The trial court analyzed all four elements and made factual findings as to each before reaching his conclusion as to the rent commencing on January 1, 2004.

On appeal, we accept these findings if they are supported by substantial evidence. In applying the substantial evidence standard, this court's "'review begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the trial court's factual determinations. . . .'" (*Monks v. City of Rancho Palos Verdes* (2008) 167 Cal.App.4th 263, 295.) The test is whether it is "reasonable for a trier of fact to make the ruling in question in light of the whole record." (*Buckley v. California Coastal Com.* (1998) 68 Cal.App.4th 178, 192.) In the previous incarnations of this matter reflected in *Santa Fe II*, the Court of Appeal pointed out that, where one of the ATF factors found by the trial court was "within the range of expert testimony provided," it was supported by substantial evidence, even when the Court of Appeal found the trial court's reasoning to be erroneous.[29] (*Santa Fe II, supra*, A103990.) With this standard of review in mind, we look to the trial court's findings of each ATF factor.

### 1. Total Value

The burden to prove the elements of its case is on the plaintiff. Here, the Railroad alleged in its complaint that the Pipeline owed rent on certain easements "within [the Railroad's] right-of-way property." It sought a judicial declaration of the amount of rent due pursuant to the AREA, which includes the provision that the Pipeline's easements are in, upon, along and across the "property of [the] railroad." Thus, the Railroad must prove

---

[29]     The comment by the Court of Appeal in the 1994 case referred to the trial court's assessment of the "use factor," discussed below.

the total value of the land occupied by the easements that travel through the property of the Railroad. It failed to do so. Therefore, while the court's overall approach to valuation was correct, it could not insert a correct dollar amount for the first element of the ATF calculation.

Evidence before the trial court "most commonly showed that [the Railroad] originally acquired title through one or more" of the Congressional Acts. The court recognized that the Railroad obtained the land "for railroad use, not outright grants of permanent full fee property rights," and that it held less than full fee title to such lands. We have taken judicial notice of the pre-1871 and 1875 Congressional Acts and the decisional law interpreting them. (Evid. Code, §§ 451(a), 459.) As explained above, pursuant to that body of law the Congressional Acts did not grant the Railroad sufficient rights to the subsurface to allow it to collect rent from the Pipeline for its use of that property.

The trial court also noted that some parcels, however, were acquired by grants from states or other grantors. Moreover, there was testimony at trial that the Railroad could have obtained rights to the parcels containing the pipelines through numerous other means. In addition to conveyance of a fee interest to a railroad by individuals or states, methods discussed at various points in trial included, for example, condemnation, quitclaim deeds, purchase, quiet title actions, the California Marketable Record Title Act (Civ. Code, § 880.020 et seq.) or similar statutes in other states, adverse possession, waiver or consent from the owner of the servient estate, etc., or through a declaration or decree of a court of competent jurisdiction or an act of Congress. Indeed, evidence was presented that as much as 50 percent of the Railroad's rights-of-way were held or acquired through methods other than the Acts of Congress, and 32 percent is claimed to be held in fee. If the Railroad ultimately obtained an entire parcel in fee, there is no servient or dominant estate in that parcel. A servitude is extinguished "[b]y the vesting of the right to the servitude and the right to the servient tenement in the same person." (Civ. Code, § 811.) In that circumstance, the Railroad would own both the surface and the subsurface, which it could lease out as it sees fit—whether for railroad purposes or not.

57

The trial court made no specific finding as to the nature of the Railroad's property interest. Yet it concluded that title to "virtually all of the subject property" had been adequately shown. The implication was that all of the Pipeline's easements are within the "property of the railroad." In reviewing the record, we do not find substantial evidence to support this finding. It appears clear that some of the pipelines are, and some of them are not, within the property of the railroad.

At oral argument, counsel for the Railroad claimed the trial court had determined that for purposes of the AREA the Railroad had proven its case in terms of what was the property of the railroad. But the trial court did not make a finding that the Railroad owned any particular parcel. Indeed, the court expressly stated that the Railroad "did not offer direct evidence of its title" and that "[f]ew records, if any, reflected title in the Railroad in fee simple." As noted above, it concluded in its statement of decision that the Railroad lacked full fee title.

Because the trial court did not make a finding as to the "property of the railroad" under the test we have set forth today, it follows that there was no substantial evidence of total value. Once the "property of the railroad" has been determined on remand, then the trial court can determine the total value and apply the remaining ATF factors.

2.      *Enhancement Factor*

The record reveals that the trial court considered a massive amount of evidence in reaching his conclusions regarding the enhancement factor, as well as the other ATF factors. Its discussion in the statement of decision has subsets for conflicting opinions, theoretical considerations, inferences from the Pipeline's new construction off of railroad right-of-ways, the opinions of experts from both sides, availability of alternatives, among numerous others. The trial court also recognized that the easements were along an existing transportation corridor, which represented a very substantial savings to an easement user compared to the cost of assembling a new corridor for its easement. All appraisers agreed that this was the highest and best use of the subject property, which is generally not more than 10 to 12 feet wide but extends lineally over 1,800 miles. The trial court considered how the market valued these types of property interests.

One of the Railroad's experts testified to enhancement factors between 1.0 and 1.5, depending on density of development ATF, and other factors. Another of its experts said the range was 1.0 to 1.25, again depending on the density of the development. When looking at market data, the first expert set the range at 1.11 to 2.09 times ATF land value. The other opined that the range was between 1.0 and 6.83 times ATF land value. The trial court found an enhancement factor of 1.25. This was supported by substantial evidence and was well within the range of the testimony of the expert witnesses. Unless it appears on remand that the determination of the "property of the railroad" in some way affects the calculation of the enhancement factor, the trial court's finding regarding that factor will not be disturbed on appeal.

### 3. *Use Factor*

A similar analysis applies to the trial court's determination of the use rate (or percentage of fee) factor. Here, the trial court considered, among other things, the approach of appraisers from both sides, the policies of other railroads, and other transactional data. One of the Railroad's experts opined that the market value of the subject easement was 60 percent of the corridor value of the strip of land it occupied, and that market data indicated use rates between 50 percent and 90 percent. Another expert testified that on average the market value of the easement was 65 percent of the underlying fee value. The trial court considered the opinion of the Pipeline's expert as well, who concluded that the use rate was between 33 percent and 50 percent of the fee value to subsurface rights. He relied heavily on the conclusion of the judge in *Santa Fe II* and arrived at 40 percent as the most appropriate use factor.

The trial court concluded that the most reasonable use factor was 60 percent of the underlying fee value of the easement, but 70 percent for those line sections that were seven feet or less. These findings are within the range of the expert testimony and supported by substantial evidence. As with the enhancement factor, unless it appears on remand that the determination of "property of the railroad" in some way affects the calculation of the use factor, the trial court's finding regarding that factor will not be disturbed on appeal.

## 4.    *Rate of Return*

As to the rate of return, the trial court heard expert testimony and received documentary evidence of the Railroad's policies and practices, as well as those of other railroads. The Railroad presented evidence that the rate of return should be between 10 percent and 16 percent. The Pipeline's experts opined that the range was closer to 6 percent to 8 percent. The trial court concluded that the Railroad's experts were more believable. It also considered recent transactions by the Railroad, which reflected it was able to generate a rate of return of 13 percent in those cases.

In reaching its conclusion, the trier of fact must arrive at a number comprising values within the range of the testimony for each component factor. (*People ex rel. Dept. Pub. Wks. v. Jarvis* (1969) 274 Cal.App.2d 217, 226-227.) He may accept the evidence of any one expert or choose a figure between them based on all of the evidence. But there is insufficient evidence to support a verdict "'only when "no reasonable interpretation of the record" supports the figure . . . .'" (*San Diego Metropolitan Transit Development Bd. v. Cushman* (1997) 53 Cal.App.4th 918, 931.)

Here, the trial court concluded that the most appropriate rate of return was 10 percent. This is clearly within the range testified to by the experts, and is supported by substantial evidence. As with the other ATF factors, this court will not substitute its judgment for that of the trial court, which heard the testimony and considered the evidence at trial.

## C.    **Must the Pipeline Pay Rent to the Railroad for Easements Within Property That the Railroad Sold Prior to 1994?**

The Pipeline also contends it need not pay rent for easements under rights-of-way property that the Railroad sold to third parties. We make two preliminary observations. First, given our earlier discussion regarding the "property of the railroad," the Railroad had no right to collect rent on subsurface easements under rights-of-way acquired solely via the Congressional Acts. It follows, then, that the sale of those rights-of-way by the Railroad to third parties did not somehow confer a right to collect rent from the Pipeline for those easements. However, even if—as the Railroad claims—the Congressional Acts had

60

conveyed sufficient property rights to the Railroad to warrant its renting out the subsurface to the Pipeline as it actively used its right-of-way for railroad purposes, new and different considerations come into play once the Railroad ceases, forfeits, or abandons its use of the right-of-way altogether. Second, we note that at trial the parties litigated the Railroad's right to charge rent as to those rights-of-way sold before and after 1994, but on appeal the Pipeline only claimed error as to the properties sold before 1994.[30] Those are the only ones directly addressed here.[31]

The Railroad claims it has the right to continue to collect rent on pipeline easements within properties it had already sold when the AREA was signed, because the AREA itself indicates that the list of existing easements included some that were "located on property previously owned by Railroad, but not owned by Railroad as of the date [of the AREA]." (AREA, § 1.(d.).) Furthermore, the Railroad contends, when it sold these parcels to third parties it included a reservation of rights to subsurface easements that contained the pipeline, and also reserved the rights to collect rent on the pipelines as "easements in gross."

In the trial court, the Railroad took the position that it did own the land through which it granted the Pipeline's easements, and thus had the right to reserve easements to itself and continue to collect rent from the Pipeline after it sold its right-of-way to third parties. When the Pipeline filed a cross-complaint arguing otherwise, the Railroad filed a motion for judgment on the cross-complaint stating, "Importantly, when [the Railroad] made these reservations it owned the property conveyed. These reservations are valid because as owner of the servient tenement, [the Railroad] could grant additional easements or reserve an easement for itself." While conceding that an easement holder cannot grant an

---

[30] The main parcel in dispute is the Iron Horse Trail (Line Section 16), which accounts for over $1 million of the 2004 base-year rent found by the trial court. The other pre-1994 properties include sales to the State of California (Sacramento), LACTC Taylor Yard, LACTC Santa Ana Branch Crossings, Brisbane Terminal, as well as the Kern County Land Company.

[31] At trial, there was also a dispute about when the Pipeline abandoned certain easements, and when the obligation to pay rent on those easements ceased. While the trial court made findings in that regard, neither side raised the issue on appeal.

easement on its easement, the Railroad claimed that "[i]n this case an easement holder did not grant an easement. Instead, Union Pacific [was the] *grantor . . . .*" (Italics in original.)[32]

The trial court found that the Railroad "h[e]ld less than full fee title" to the land, but it nevertheless concluded that the Railroad had the right to continue to collect rent from the Pipeline on property it sold to third parties, if it included a reservation of that right as part of its conveyance.[33] While the issue here overlaps with the issues raised above regarding whether the Railroad can collect rent on easements that are not within the "property of the railroad," additional issues are raised as to what happens when the land is no longer used or occupied by the Railroad at all.

As the railroads began to abandon and/or forfeit their rights-of-way, questions arose as to what would become of these parcels of land. Congress passed an act regarding the disposition of abandoned or forfeited railroad grants in 1922. (43 U.S.C. § 912.) That act provided that when the use and occupancy of the railroad's right-of-way has ceased, whether by forfeiture or abandonment, ownership reverts to the federal government or its grantees (unless for a public highway legally established within one year). (*Ibid.*) With certain exceptions, the land either reverts to the federal government or its grantees (in the case of land grants by the pre-1871 Acts) or the servient tenement holder becomes the owner of the entire property (in the case of easements by the 1875 Act).

Not surprisingly, railroads attempted to sell their rights-of-way to third parties when they ceased using them for railroad operations. But the alienability of railroad rights-of-way

---

[32]    While claiming it was the owner of the property, the Railroad also argued that it did not need to own the property in fee in order to grant the easements, that it did not need to prove ownership to collect the rent, and that it was entitled to the rent "whether or not [the easements] were on property owned by [the Railroad]."

[33]    The trial court's ruling came with the proviso that Pipeline need not continue to pay rent to the Railroad if a subsequent owner presented a valid claim demonstrating that he or she was entitled to collect the rent instead. The court did not address the issue of whether the subsequent owner would be entitled to payment of back rent already paid by the Pipeline to the Railroad.

created solely by the Congressional Acts generated questions, since the railroads did not own the land in fee to begin with. The *Townsend* court noted early on that "the land forming the [railroad's] right of way was not granted with the intent that it might be absolutely disposed of at the volition of the company. On the contrary, the grant was explicitly stated to be for a designated purpose, one which negated the existence of the power to voluntarily alienate the right of way or any portion thereof." (*Townsend, supra*, 190 U.S. 267, 271.) The high court went on to say that, "'a railroad company is not at liberty to alienate any part of its roadway so as to interfere with the full exercise of the franchises granted.'" (*Ibid.*) Based upon *Townsend*, the 10th Circuit United States Court of Appeals concluded that "the railroad cannot alienate any interest in the right-of-way which was granted it by the United States for the express purpose of building a railroad." (*Energy Transp. II, supra*, 606 F.2d at p. 938.)

Under the various statutes relating to abandonment or forfeiture, court or congressional action were often required. These were sometimes obtained, but not without controversy. For example, in 1997 a House of Representatives Committee recommended approving the conveyance of certain parcels of the Southern Pacific Railroad in Tulare County, California for local development. The rights-of-way had been originally granted to the railroad in an 1866 act. A report from the Committee on Resources accompanying House Bill No. 960 recognized that if the railroad ceased to operate on the right-of-way, the land comprising the right-of-way would revert to federal ownership. The report discussed the reasons that it recommended validating the conveyances to Tulare County, as opposed to having the land revert to the federal government. But additional views were presented, which pointed out that while Tulare wished to buy the right-of-way from the railroad, "[t]he railroad . . . does not own the land (the taxpayers do), and so the title is not cleared to convey." Nevertheless, the authors said, the proposal would allow the railroad to clear title to sell these lands and profit from their disposal, and expressed concern that the "[p]assage of this legislation should not be perceived as endorsing the concept of the federal government giving away public rights without just compensation." (H.R.Rep. No. 105-171, 1st Sess., pp. 6-7 (1997.)

Such plans to validate railroad rights-of-way conveyances were not uncommon. Another came before Congress in 2004, involving rights-of-way initially granted to a railroad in 1862. In the report supporting the act, the Senate Committee on Energy and Natural Resources (Sen.Rep. No. 108-305, 2d Sess., p. 2 (2004)) cited *Railroad Co. v. Baldwin* (1880) 103 U.S. 426, 429-430, for the proposition that the right-of-way grants were made for the companies to construct the railroad, and were made with the condition "'necessarily implied . . . that the road shall be constructed and used for the purposes designed.'" The Senate Committee also cited *Townsend*'s holding that even if called a "limited fee" there was an implied reversion to the United States in the event the company ceased to use or retain the land for the purpose for which it was created. (*Townsend, supra*, 190 U.S. at p. 271.) The Senate Report went on to say that, "[o]n at least one hundred occasions over the years, [railroads] have attempted to convey parcels of the 1862 right-of-way land grant to others, even though the companies did not have the legal authority to make the conveyances and the conveyances were made without regard to the Federal Government's reversionary interest in the land." (Senate Report, *supra*, at p. 2.)

Similar issues regarding the property rights of railroads have arisen as a result of the shrinking use of railroad tracks and the trend to convert them to trails for recreational use. The federal "Rails to Trails" act (16 U.S.C. § 1241 et seq.) has spawned litigation regarding the rights of owners of the servient tenement when a railroad sells rights-of-way it no longer uses for railroad purposes to third parties or municipalities. Since the railroad obtained a grant for use of the land surface for railroad purposes only, it could not grant more than that to third parties. (*Geneva Rock Products, Inc. v. United States, supra*, 107 Fed.Cl. 166, 173 [railroad could not convey more than it possessed: a railroad purposes easement limited by the terms of the 1875 Act that granted it].) Thus, a railroad's grant of its right-of-way to a municipal agency for use as a recreational trail is a "taking" for which the adjacent landowners are entitled to compensation. (*Id.* at p. 167; see, *Haggart v. United States* (2012) 108 Fed.Cl. 70.)

The question here is whether the Railroad had the right to sell its rights-of-way to third parties and reserve the right to continue to collect rent on the subsurface easements.

We have already concluded that even when the Railroad uses and occupies its right-of-way, the Congressional Acts did not give it sufficient title to justify renting the subsurface to the Pipeline. But even if the acts *had* provided it sufficient title, once the Railroad sells its right-of-way, thereby ceasing to occupy and use it, either the easements would be extinguished (1875 Acts) or the servient estate would revert to the federal government or its grantees (pre-1871 Acts). Therefore, unless the Railroad had an interest in the property greater than that provided by the Congressional Acts, it could not reserve rights to the subsurface for purposes of continuing to collect rent from the Pipeline as an easement in gross.

Congress clearly intended that a railroad's interest in its rights-of-way would terminate once it no longer used or occupied the land. Continuing to have an interest in the land, and to generate revenue from it, would run directly counter to the legislative intent. It follows, then, that when the Railroad sells its interest in the property to third parties and no longer uses or occupies the surface right-of-way, it cannot collect rent from the Pipeline— unless it has title to the property greater than that conferred by the Congressional Acts (and then, only if a proper reservation was part of the conveyance). This issue turns on the nature of the Railroad's interest in the land at the time it was sold, and will need to be addressed on remand.

## IV.   Prejudgment Interest

### A.   The Trial Court Had the Authority to Determine the Issue of Prejudgment Interest

The Pipeline asserts that the temporary judge did not have authority to enter a money judgment, and, therefore, could not award prejudgment interest. A temporary judge serves pursuant to provisions of the California Constitution. His or her powers exceed those of a referee, since a temporary judge may enter judgment and hear posttrial motions, presiding over the matter "until final determination of the cause." (Cal. Constitution, art. VI, § 21; see Cal. Rules of Court, rule 2.830 et seq.) A temporary judge's judgments are appealable in the same manner as those rendered by a constitutional judge. (*Kajima Engineering and*

*Construction, Inc. v. Pacific Bell* (2002) 103 Cal.App.4th 1397, 1401-1402.) Unlike a referee, postjudgment motions are in the purview of temporary judges. (*Ibid*.)

The stipulation to appoint the temporary judge here states that the judge shall, among other things, "preside over the trial of the within matter until rendition of judgment, and shall hear and determine all post-trial motions relating to the judgment filed or to be filed herein, and act in said capacity until the conclusion of all matters herein which may be determined within the trial jurisdiction of the Superior Court." Pursuant to the parties' stipulation, the presiding judge of the Los Angeles County Superior Court appointed the temporary judge "to hear and determine the . . . matter, including all post-judgment proceedings in the trial court."

Even though the stipulations do not expressly call for a "money judgment" or "prejudgment interest," a temporary judge may go beyond the express wording of the stipulation creating him and has the power to act until final determination of the proceeding, resolving issues that are a "direct progeny" of the cause assigned to him or her for resolution. (*Gridley v. Gridley* (2008) 166 Cal.App.4th 1562, 1582.) "Direct progeny are those which are a continuation of the stipulated cause or question its finality . . . ." (*Id.* at p. 1583.)

Prejudgment interest falls under this category. Indeed, prejudgment interest is to be included as part of a final judgment by rule. (Cal. Rules of Court, rule 3.1802 [the clerk must include in the judgment any interest awarded by the court].) The temporary judge has the power and authority to determine prejudgment interest. However, for the reasons stated below, we reverse the ruling on prejudgment interest and remand the case to the trial court.

### B. The Nature of Prejudgment Interest

Prejudgment interest, by its nature, differs from other more typical forms of interest. It is a creation of statute designed to compensate for the presumed harm caused by the inevitable delays inherent in litigation. While the party that ultimately prevails awaits final judgment in his or her favor, the losing party enjoys the use of the funds in question as the lawsuit winds its way through the courts. Thus, "'[t]he purpose of prejudgment interest is to compensate plaintiff for [the] loss of use of his or her property." (*Lewis C. Nelson & Sons,*

*Inc. v. Clovis Unified School Dist.* (2001) 90 Cal.App.4th 64, 71-72; see *Macy's Dept. Stores, Inc. v. City and County of San Francisco* (2006) 143 Cal.App.4th 1444, 1459.)

To determine if a party is entitled to prejudgment interest under the code, we look to the meaning of the statute, which we review de novo. (*People ex rel. Lockyer v. Shamrock Foods Co., supra*, 24 Cal.4th 415, 432; *Topanga and Victory Partners v. Toghia, supra*, 103 Cal.App.4th 775, 780-781.) The basic rules for statutory construction are well-established. We start with the words of the statute itself. When determining their meaning, "the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted." (Code Civ. Proc., § 1858.) And "where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." (*Ibid.*) "'[O]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose . . . affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context . . . .'" (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265, citation omitted.)

Viewing the prejudgment interest statutes in their statutory context, we note that the Civil Code is divided into four divisions. Civil Code section 3287[34] falls under article 2 ("Interest as Damages") of chapter 1 ("Damges in General") of title 2 ("Compensatory Relief") of part 1 ("Relief") of division 4 ("General Provisions"). Given this statutory scheme, it would be helpful if the Legislature defined "damages."

And so it did. Section 3281 states: "Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages." Section 3287, subdivision (a) (section 3287(a)) authorizes an award of interest when a person is entitled to recover damages certain, or capable of being made certain by calculation (liquidated). Section 3287, subdivision (b) (section 3287(b)) applies when the damages cannot be so determined (unliquidated). While the two subdivisions make a distinction between damages that are liquidated and unliquidated, they have one key word in common—damages.

---

[34] All future undesignated statutory references are to the Civil Code.

In the instant case, the trial court awarded prejudgment interest to the Railroad under both section 3287(a) and 3287(b). Therefore, we must infer the court concluded that the Railroad suffered damages. Prejudgment interest was awarded pursuant to section 3287(a) at the rate of 10 percent per annum on the amounts of rent unilaterally withheld by the Pipeline for reserved easements, for abandoned easements, and for line section 101. And prejudgment interest was also awarded under section 3287(b) at a rate of 5.25 percent per annum on the unliquidated amounts of back rent starting on January 1, 2004. The total amount of prejudgment interest at the time of entry of judgment was $19,372,195.50.

The Pipeline argues that the temporary judge erred by awarding prejudgment interest. Besides its contention that the parties' stipulation did not give him the authority to award it, it also argues that no prejudgment interest is allowed because there were no "damages" suffered by the Railroad. According to the Pipeline, the AREA did not contemplate an award of prejudgment interest. Instead, it reflected an agreement between the parties that if they could not agree on the amount of increased rent, they would have their dispute resolved in a judicial proceeding, with all its inherent delays. The parties dealt with the judicial delay in establishing new rent by having the Pipeline continue to pay the same rent as in 2003, plus a CPI adjustment every year, until judgment was entered by the court. Therefore, the Pipeline asserts, the parties reasonably expected and agreed that there would be no prejudgment interest to compensate for any litigation delays.

The Railroad, on the other hand, argues that the terms of the AREA are irrelevant to the question of prejudgment interest because the issue is one of law, and is not dependent on a contract between the parties. It also claims that "damages" is defined broadly by our courts, and applies where one party owes a money judgment to another, regardless of whether there was any wrongdoing or fault. Since the Railroad had to wait for its rent while the Pipeline held onto the money as the lawsuit proceeded, it argues that interest should run, and should be included in the judgment in order to provide it with fair and just compensation. We agree with the Pipeline.

## C. The Meaning of "Damages" in Section 3287

Section 3287 expressly requires that before being awarded prejudgment interest a party must first be entitled to recover or receive damages. (§ 3287, subds. (a) & (b).)[35] The Pipeline claims the Railroad suffered no damages here, since the Pipeline committed no "unlawful act or omission" and thus was not a "person in fault," as required by the plain language of section 3281. Instead, the Pipeline was merely proceeding along lines both sides had agreed to. Since it suffered no damages, the Railroad cannot collect prejudgment interest.[36]

The Railroad counters that since the term "damages" has been construed broadly, an unlawful act or omission is not required, despite the statute's plain language. It claims that "neither a breach of contract nor an 'unlawful' act is required to receive damages for purposes of prejudgment interest." Thus, the Railroad contends, prejudgment interest is available whenever money is recovered by a party for loss suffered through the acts of another "whether or not unlawful," and therefore "no fault or unlawfulness is required." For this proposition, the Railroad relies in large part on *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807 (*AIU*). However, *AIU* says nothing of the sort. Indeed, when discussing damages in a declaratory relief action, our Supreme Court quoted section 3281 and said:

> "As our cases have pointed out, this provision is intended to represent the plain and ordinary meaning of the word 'damages.' [Citations.] Other lay and legal definitions are similar. One dictionary, for example, defines 'damages' as 'the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused *by a violation of a legal right*.' (Webster's New Internat. Dict. (3d ed. 1981) p. 581.) Black's Law Dictionary similarly defines 'damages' as '[a] pecuniary

---

[35] Section 3287(a) states, "A person who is entitled to recover damages certain, or capable of being made certain by calculation . . . is entitled also to recover interest thereon . . . ." Section 3287(b) states, "Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon . . . ."

[36] The Railroad implicitly concedes that there was no wrongful or unlawful act by Pipeline in proceeding via the AREA dispute resolution process, since it makes no claim to the contrary in any of its briefs, either in the trial court or on appeal.

compensation or indemnity, which may be recovered in the courts by any person who has suffered loss, detriment, or injury, whether to his person, property, or rights, *through the unlawful act or omission of another*.' (Black's Law Dict. (4th ed. 1951) p. 466, col. 2.)" (*AIU, supra*, 51 Cal.3d at pp. 825-826, italics added.)

When one of the parties in *AIU* argued (as the Railroad does here) for a broader definition of damages, the court rejected that approach. (*AIU, supra*, 51 Cal.3d at p. 826, fn. 12.)

The Railroad also cites *Jamison v. Jamison* (2008) 164 Cal.App.4th 714 (*Jamison*) for the proposition that "*no fault or unlawfulness is required* for money awarded at trial to be deemed damages subject to prejudgment interest." (Italics added.) It goes on to claim that *Jamison* confirmed a broad interpretation of damages, rejecting the concept that if "no fault or wrongfulness [were] involved and therefore [were] no 'damages.'" The Railroad's characterization of the holding in *Jamison* misses the mark by a wide margin. It leaves out the *Jamison* court's statement that "*in this context*" whether or not fault or unlawfulness was required made no difference. (*Jamison*, at p. 720, italics added.) And the "context" to which the court refers was whether the plaintiff was required to make a motion for new trial on the grounds of insufficient damages before appealing to a higher court. In *that context*, it did not matter whether the other side was at fault or not; plaintiff's motion for new trial was untimely either way, and therefore its appeal was improper. In no way did the court re-define or broaden the definition of damages, or imply that wrongfulness was not required. In fact, *Jamison* cited *County of Los Angeles v. Southern Cal. Edison Co.* (2003) 112 Cal.App.4th 1108, 1121-1122, which opined that when the concepts of fault or unlawfulness do not enter into the equation, an award of money from one party to another is not technically damages under section 3281. (*Jamison*, at pp. 720-721.)

Lastly, the Railroad claims that "the amount of money recovered *in any judgment* may properly be described as damages" under section 3287. (Citing 23 Cal.Jur.3d (2008) Damages, § 1.)[37] This clearly implies that, according to this authority, money recovered "in

---

[37] The sentence cited by the Railroad in California Jurisprudence Third regarding "any judgment" refers to a 1902 case, *Keyes v. Moy Jin Mun* (1902) 136 Cal. 129.

any judgment" is considered damages for purposes of prejudgment interest, regardless of whether there is fault or unlawful conduct. However, California Jurisprudence Third does not say that. The first sentence of its section on damages states: "The term 'damages' refers to the monetary sum assessed by a court against a *wrongdoer* for the commission of a *legal wrong* of a private nature." (23 Cal.Jur.3d, *supra*, Damages, § 1, p. 17, italics added.) It goes on to state that it is "provided by statute that every person who suffers detriment *from the unlawful act or omission of another*, may recover from the person in fault a compensation therefor in money, which is called damages," citing section 3281. (23 Cal.Jur.3d, *supra*, Damages, § 1, p. 18, italics added.) In its supplement, California Jurisprudence Third cites more recent cases, like *Jamison* and *Citizens of Humanity, LLC v. Costco Wholesale Corp.* (2009) 171 Cal.App.4th 1, 19, which opined that "damages" are "'monetary compensation for loss or harm suffered . . . as the result of the unlawful act or omission of another.'" Therefore, to the extent California Jurisprudence Third provides guidance, it clearly supports the Pipeline's position that there must have been something wrongful about their conduct before the Railroad would be entitled to damages in the form of prejudgment interest.[38]

More recent cases have upheld the definition when it comes to damages and prejudgment interest. In *Estate of Kampen, supra*, 201 Cal.App.4th 971, the court reiterated that "damages" refers to "monetary compensation recoverable by a person who has suffered detriment from the unlawful act or omission of another," citing section 3281. (*Kampen, supra*, at p. 990.) Since in *Kampen* there was no unlawful act or omission, there could be no damages. Thus, there could be no prejudgment interest.

Simply put, section 3281 defines damages as involving unlawful conduct by a "person in fault" and section 3287 requires damages before prejudgment interest may be

---

[38]    The Railroad also cites *Moreno v. Jessup Buena Vista Dairy* (1975) 50 Cal.App.3d 438 to support its claim that prejudgment interest may be awarded even though there was no breach or wrongful act. But in that case, no prejudgment interest was awarded; the interest awarded ran from the time judgment was entered. (*Id.* at p. 448.)

awarded. With this construction in mind, we review the trial court's order granting the Railroad's motion for prejudgment interest.

**D.     Following Remand, the Railroad May Be Entitled to Prejudgment Interest on Liquidated Amounts Under Section 3287(a)**

The trial court ordered the Pipeline to pay prejudgment interest under section 3287(a) "on the amounts of rent unilaterally withheld" by the Pipeline for "[r]eserved [e]asements, for [a]bandoned [e]asements and for Line Section 101 . . . ."[39] The trial court applied a 10 percent interest rate pursuant to section 3289, subdivision (b), because the AREA does not stipulate a legal rate of interest. These are liquidated damages because a specific, known amount was withheld by the Pipeline, which was "certain, or capable of being made certain by calculation," on a particular day. (§ 3287(a).) The parties do not dispute that the amounts claimed under section 3287(a) are liquidated. The Pipeline knew precisely the amount involved; the disagreement at trial was the Pipeline's liability for rent on these particular easements, not the amount owed if liability was determined.

Whether the Pipeline was liable for the payment of rent on the reserved easements, abandoned easements, or Line Section 101, will have to be determined on remand, after additional fact-finding consistent with the opinions stated herein. If the trial court finds that the rent was due and that withholding it was wrongful, a monetary award would meet the definition of damages under section 3281. Until such time, however, the ruling that the Pipeline owes prejudgment interest under section 3287(a) on liquidated amounts is vacated, pending further proceedings in the trial court.

**E.     The Railroad Is Not Entitled to Prejudgment Interest on Unliquidated Amounts Under Section 3287(b)**

Unlike prejudgment interest under section 3287(a), an award of prejudgment interest on unliquidated amounts under section 3287(b) is discretionary with the court. It must

---

[39]     "Line Section 101" was part of the subject property in 2003, when the Pipeline transferred their rights to Conoco Phillips, along with their rights in the subject easement for that line section.

consider the circumstances, realizing a party cannot pay the amount due until it is determined what that amount was—which in this case was the reason for the litigation in the first place. The original prejudgment interest statute (§ 3287(a)) did not require a losing party to pay interest when it could not know how much to pay. In 1967, the Legislature added section 3287(b) to allow prejudgment interest to be awarded even on unliquidated amounts, in the court's discretion. (*A & M Produce Co. v. FMC Corp*. (1982) 135 Cal.App.3d 473, 496.)

As noted above, the Pipeline asserts its conduct was not unlawful because the agreement and expectations between the parties, as reflected by the AREA, was that no prejudgment interest would accrue. The Railroad claims that the Pipeline's reliance on circumstances surrounding the AREA's creation are irrelevant because its right to prejudgment interest is based on the law, and is not dependent on the existence of a contract in any event. But by law, the Railroad must have suffered damages, which requires that the Pipeline engaged in unlawful acts or omissions and was a "person in fault." To determine if that was the case, we must consider the context of the Pipeline's actions, which in turn requires us to inspect the contractual relationship between the parties and why the Pipeline did not pay the rent later determined to be owed as it became due after January 1, 2004.[40]

### 1. *The Contractual Relationship Between the Parties*

The trial court awarded prejudgment interest under section 3287(b) on "the unliquidated amounts of back rent" in the amount of 5.25 percent per year, accruing from the date each payment came due.[41] By implication, the court must have found that the Pipeline wrongfully failed to pay the back rent during the pendency of this litigation, resulting in damages to the Railroad. Ordinarily, we review a ruling that awards

---

[40]     There is no dispute that the Pipeline paid the rent due based on the rent as of December 31, 2003, plus the CPI adjustment (with the minor exceptions already noted). The back rent accrued because the increase in the amount due had not yet been determined by the trial court in this litigation.

[41]     Under the statute, however, no prejudgment interest could accrue on unliquidated amounts prior to the date the complaint was filed. (§ 3287(b).)

prejudgment interest under section 3287(b) for an abuse of discretion, since by its terms the statute allows for such an award in the discretion of the trial court. However, we first must determine whether the trial court misinterpreted or misapplied the statute, thereby committing an error of law.

Although this case arises from a written contract between the parties—i.e., the AREA and subsequent modifications—it is hardly your typical, garden-variety breach of contract case. The Railroad, after all, does not claim the Pipeline breached the terms of the AREA with regard to back rent. Rather, it claims the delay in payment as it waited for the litigation to resolve entitles it to prejudgment interest in order to be made whole. At this juncture, it is helpful to step back and revisit the history of these parties. Whatever the true nature of its property interest, the Railroad controlled the land through which the Pipeline wished to run its pipelines. There were no third parties directly involved, and no arms-length transactions. In their master agreement, the sister companies agreed on the proposed easements, and on the rent due from one party to the other.

But when the companies were no longer siblings, litigation ensued. When the parties settled their case in 1994, the settlement agreement provided that interest was to be paid on outstanding tax and insurance payments, but it did not call for interest on back rent if there was a dispute as to the amount that was owed. The AREA was silent on whether interest would accrue during pending litigation. Subsequent to the signing of the AREA in July 1994, the parties entered into a side letter agreement dated September 9, 1994, which incorporated the AREA and its exhibits. Among other things, this agreement addressed what payments should be made if there was no agreement on the increased rent and subsequent litigation was required. However, it also states: "During the pendency of any Reference Proceeding or appeal, [Pipeline] agrees to pay to Railroad the per annum sums set forth on Exhibit E, annually in advance . . ." subject to the CPI adjustments set forth in the

AREA. It also anticipates entry of judgment, but says nothing about any prejudgment interest running during this time.[42]

The settlement of the 1991 lawsuit resulted in at least three written agreements in 1994—the settlement agreement in April, the AREA in July, and the side letter agreement in September. In a very real sense, this case is in the nature of an action to enforce a settlement agreement which calls for long-term installment payments. The agreement calls for regular annual increases in these installment payments, but also provides for the baseline payment to be "reset" every 10 years (presuming the likely scenario that the CPI would not keep up with market values in this arena). The parties have not been able to agree on a term of their settlement (i.e., the baseline rent for the decade beginning January 1, 2004), and have come to court to resolve it. Therefore, the Railroad's contention that the contract provisions and/or the AREA are irrelevant to the issue of prejudgment interest is unpersuasive. The contracts, including the AREA, set the stage for the parties' litigation in the first place. They shed light on whether there has been any wrongful conduct, which in turn determines whether any party has suffered damages that justify an award of prejudgment interest.

2. *Was the Pipeline's Failure to Pay the increased Rent When It Became Due "Unlawful" Under the Terms of the Settlement Agreements?*

The parties agreed about what was to occur while litigation was pending. They were sophisticated business entities represented by counsel, and clearly recognized that if they could not agree on a baseline rent, time would pass as they litigated the matter in court. They could have provided for interest to accrue on unpaid rent while they were waiting for a judicial determination. Or they could have been silent on the subject, assuming a "default

---

[42] This "side letter" is not the AREA itself, but is a modification of it that clarifies certain terms. The Railroad's complaint explicitly seeks a finding of the fair market value of the easements "as amended and restated in the AREA (and subsequent modifications)." Thus, this subsequent modification is part of the "contract" upon which the Railroad brings suit.

position" that was provided by law.[43]  But they did neither.  Instead, they addressed the issue in the 1994 settlement and expressly agreed what to do during the pendency of the litigation:  The Pipeline would continue to pay the baseline rent, adjusted annually for the CPI.  There was no provision for prejudgment interest.

In addition, this provision of the settlement agreement illuminates the issue of wrongdoing as the law uses that term in relation to damages and interest.  If the Pipeline had engaged in some sort of unlawful conduct by failing to pay any rent during the pendency of the dispute, prejudgment interest could well be in order, regardless of any agreement between the parties.  But that is not the case here.  Instead, the Pipeline merely proceeded along the path negotiated and anticipated by each side in their mutual settlement agreement.  It paid the baseline rent, plus the CPI increases, as the parties engaged in prolonged and complex litigation.  This is precisely what the parties agreed to.  Indeed, that is all the Pipeline could do, until the trial court ruled on the question of the baseline rent commencing on January 1, 2004.  There was no breach of contract, nor any hint or claim of any wrongdoing in this regard.[44]  Thus, by definition, there were no "damages."  Under these circumstances, it would defy the terms of the statute to award prejudgment interest on the back rent.  Moreover, it would be unjust and unwise.

It would be unjust, not only because the Pipeline acted precisely as the parties agreed while waiting for the litigation to play out, but because the circumstances are very asymmetrical here.  It was obvious from the start the Railroad would be collecting rent, and that as it awaited judicial resolution "back rent" would build up.  With the few exceptions discussed above, there was no question of the Pipeline's liability for rent payments; it was

---

[43]    Where parties do not address prejudgment interest in their agreement, it may still be awarded in the event of litigation.  (§ 3289.)

[44]    The AREA actually provides that if the parties cannot agree on the amount of the rent increase, "upon request of *either* party" they shall stipulate to a judicial reference proceeding.  (Italics added.)  This is not a case where one side was "wronged" and the other side sought compensation.  Under the AREA, if the parties could not agree on the new rent, either side could have commenced litigation and the other side would have been called "the defendant."

76

simply a matter of how much the rent should be.  Neither side considered that the Pipeline could "win" the case and not have to pay rent at all.  Under the Railroad's "heads I win, tails you lose" theory, it would receive prejudgment interest no matter what the Pipeline did or what happened at trial; and no matter how fair or diligent the Pipeline was in avoiding fault or wrongdoing.

For example, at trial the Railroad could be fairly seen as the "victorious party"[45] since it got most of what it sought.  The Pipeline, after all, is filing the appeal.  But even if the trial court had awarded an amount favorable to the Pipeline (e.g., very little increase in rent), pursuant to the agreement no court-determined rent increase would have been paid during the pendency of the litigation.  Indeed, that is just what happened in *Santa Fe II*.  There, the Railroad was unhappy with the trial court's judgment, thinking it was too low.  The case was re-tried.  The Railroad was still unhappy with the results.  It appealed again.  When judgment was affirmed, the Railroad still felt the result was unsatisfactory (it was clearly not the "victorious party") and the Pipeline was happy with the result.  Nevertheless, the Railroad claimed it was entitled to prejudgment interest.[46]  But the statute is designed to provide prejudgment interest to be paid to a plaintiff by a wrongdoer.  It hardly furthers the legislative intent to award such interest to one party where the other party did nothing wrong and emerged victorious.

Discretionary prejudgment interest would also be unwise, because under the circumstances of this case, if prejudgment interest were allowed to accrue it would be an incentive for the Railroad not to agree to the amount of any future rent increase, and to prolong litigation.  The Railroad would get its rent either way, plus the CPI annual increase.

---

[45]     When the Pipeline appealed the superior court's denial of its petition to compel arbitration, this court described the Railroad as the "victorious party." (*Santa Fe Pacific Pipelines, Inc. v. Union Pacific Railroad Company* (June 19, 2013, B240842) [nonpub. opn.].)  That is a fair description under the circumstances.

[46]     The First District Court of Appeal denied prejudgment interest, but on the grounds that the Railroad's claim was untimely.  It did not reach the merits of whether it was entitled to such interest. (*Santa Fe III, supra*, A113858.)

But by dragging out the case it would reap the added benefit of up to a 10 percent return on the money it was waiting for. So why rush? Why work to compromise or resolve the case? Since it could not "lose" the case no matter what, the ability to collect prejudgment interest would serve as a buffer to any refusal to compromise, and would finance any delays in the interim. Meanwhile, the Pipeline would be at a clear disadvantage because it could not stop interest from running.

In conclusion, the Legislature's wisdom in requiring that one must suffer damages due to unlawful conduct as a prerequisite to an award of prejudgment interest is apparent. Unlike most civil cases, this is not a case where one party failed to live up to its legal duties or obligations while the other party was forced to wait for compensation pending the slow progress of litigation. It is not a case where "justice delayed was justice denied." Rather (with the potential minor exceptions discussed above), the Pipeline did not breach its agreement to pay rent here. Instead, it proceeded upon a preset plan that each side had anticipated and had stipulated to, knowing full well that during the time litigation was underway no provision required one side to pay ongoing interest to the other. As to this aspect of the case, neither side suffered a "detriment from the unlawful act or omission of another." (§ 3281.)

We recognize that, while waiting for this case to resolve, the Pipeline had the use of funds that ultimately would go to the Railroad as rent, and that the Railroad would have had the benefit of those funds had the rent eventually ordered by the court been paid earlier. But prejudgment interest is a creature of statute, and its terms are defined by the Legislature. By definition, no damages were suffered by the Railroad when the Pipeline paid only the baseline rent (plus CPI increases) during the pendency of this litigation, since no unlawful act or omission occurred as the parties proceeded according to their mutual agreement. Thus, there could be no prejudgment interest under section 3287(b).

The trial court erred in awarding interest under section 3287(b), and that part of the judgment is reversed.

## V.  Conclusion

Over 150 years ago, the United States government began providing private companies with corridors through public lands in order to build and operate transcontinental railroads.  As decades passed, these land corridors became valuable for other purposes as well, such as the transport of oil and gas beneath the surface.  The threshold question in this case is whether the railroad companies may reap the benefit of that additional value solely by virtue of the initial conveyances from the federal government.  We answer that question in the negative.

The Railroad brought this action for declaratory relief, asking the court to determine the amount of rent owed by the Pipeline for easements that run through the right-of-way "property of the railroad."  At a minimum—especially given the history, law, circumstances, and context of how the Railroad obtained its rights-of-way in the first place—the Railroad has the burden to prove what the property of the railroad is.

The trial court concluded that the Railroad had sufficient interests in the property to grant subsurface easements and collect rent from the Pipeline.  But where the Railroad acquired its property interests solely from the Congressional Acts, the trial court's judgment was in error.  Since the acts alone did not provide the Railroad with sufficient property rights to rent the subsurface to the Pipeline, in some instances the Railroad may be seeking to collect rent for the use of property owned by others—either private third parties or the federal government (or its grantees).

This will come as no surprise to the Railroad, which was aware long before the 1994 AREA of potential problems with renting out the subsurface to the Pipeline.  As its in-house attorney counseled in the mid-1970's, "in view of the unfavorable trend of California decisions interpreting grants to railroad companies," he believed that "consideration need [*sic*] be given as to the advisability of granting to [the Pipeline] an easement for pipelines in the property classified as limited title and easement for railroad purposes . . . unless it is feasible for Railroad to take steps necessary to establish that it is the fee owner of the right of way in which [the] pipeline is located."  Counsel had presciently anticipated the problem here:  The Railroad failed in this litigation to take the steps necessary to establish its fee

79

ownership or other interest in the property sufficient to entitle it to grant easements in the property where the pipelines are located. To the extent that the trial court awarded rent to the Railroad without determining whether it had such ownership or interest, it erred and its judgment must be reversed.

However, there was evidence presented at trial that in some sections of the rights-of-way the Railroad did have sufficient property interests in the subsurface to justify the collection of rent. As noted above, there are multiple ways in which this may have occurred. But the trial court made no specific findings in that regard. The case must be remanded in order for it to do so.

With this opinion, we make no global ruling as to the validity of the AREA or the 1994 settlement agreement as a whole. When one portion of an agreement is invalid, its valid parts may be enforced. (§ 1599.) We merely hold that (1) the pre-1871 and 1875 Congressional Acts, by themselves, did not convey a sufficient property interest to the Railroad to justify its collecting rent on the Pipeline's subsurface easements; and (2) the Railroad has the burden to prove what parcels were the "property of the railroad" from January 1, 2004, through December 31, 2013, before it can collect rent from the Pipeline for easements traversing those parcels during that period of time.

In short, the Railroad seeks rent from the Pipeline for the use of certain property. To collect that rent, the Railroad must demonstrate what interest it has in that property.

**DISPOSITION**

As to the judgments on the complaint and the two cross-complaints:

(1) The trial court's finding as to the "total fee value" for purposes of its ATF calculation is reversed and remanded. Consistent with the opinions expressed herein, the court is directed to determine the total fee value of those parcels of land in which the Railroad had sufficient interest to entitle it to collect rent on the Pipeline's easements between January 1, 2004, and December 31, 2013. As to those parcels of land in which the Railroad had sufficient interest to entitle it to collect rent on the Pipeline's easements but were sold to third parties prior to 1994, the trial court shall determine the total fee value of

80

those parcels and whether, at or before the time of sale, the Railroad reserved the right to collect rent on those easements beyond January 1, 2004. The trial court may take additional evidence, at its discretion. After making the above determinations, the court is directed to reapply them to its ATF calculation.

(2) The trial court committed no error with respect to its determinations regarding issue preclusion; use of the ATF method; calculations of the rental rate, the enhancement factor, and the use factor; and the dates of abandonment of certain easements by the Pipeline. These issues need not be relitigated on remand.

(3) That part of the judgment awarding prejudgment interest under section 3287(a) is reversed and remanded in order for the trial court to determine whether, consistent with the views herein, the Pipeline was liable for the payment of rent on the reserved easements, the abandoned easements, or Line Section 101, which rent it unilaterally withheld; and, if so, the prejudgment interest due on the amounts so withheld. That part of the judgment awarding prejudgment interest under section 3287(b) is reversed.

Each side to bear its own costs on appeal.


KUSSMAN, J.*

WE CONCUR:



RUBIN, Acting P. J.



FLIER, J.

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.